[Cite as *State ex rel. Hicks v. Clermont Cty Bd. of Commrs.*, 2021-Ohio-998.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO ex rel. CHRISTOPHER HICKS, | : | CASE NO. CA2020-06-032 |
| Appellee, | : | O P I N I O N<br>3/29/2021 |
| | : | |
| - vs - | : | |
| | : | |
| CLERMONT COUNTY BOARD OF COMMISSIONERS, | : | |
| Appellant. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018CVH00058

Barron Peck Bennie & Schlemmer Co., LPA, Matthew Miller-Novak, 3074 Madison Road, Cincinnati, Ohio 45209, for appellee

Kinsley Law Office, Jennifer M. Kinsley, P.O. Box 19478, Cincinnati, Ohio 45219, for appellee

Godbey Law LLC, Robert L. Thompson, Mark E. Godbey, 708 Walnut Street, Suite 600, Cincinnati, Ohio 45202, for appellee

Isaac Wiles Burkholder & Teetor, LLC, Mark Landes, Aaron M. Glasgow, 2 Miranova Place, 7th Floor, Columbus, Ohio 43215, for appellant

**M. POWELL, J.**

{¶ 1}  The Board of Clermont County Commissioners (BCC) appeals from decisions of the Clermont County Common Pleas Court in favor of relator, Christopher Hicks (Hicks), which found that BCC violated the Open Meetings Act and awarded Hicks attorney fees. For the reasons described below, this court affirms the decisions.

### Procedural Posture/Factual Background

{¶ 2}  In January 2018, Hicks, a Clermont County resident, filed a complaint alleging that BCC failed to comply with the Open Meetings Act ("OMA"), R.C. 121.22.  Hicks alleged that BCC failed to maintain accurate meeting minutes, held a private quorum discussion of public business, and, on multiple occasions in 2017, improperly conducted executive sessions.

{¶ 3}  The parties engaged in discovery and then filed cross-motions for summary judgment.  The summary judgment record included the depositions of the three incumbent county commissioners, the county administrator, BCC's clerk, and BCC's responses to written discovery requests.  The summary judgment record established the following undisputed facts.

{¶ 4}  BCC is composed of three elected commissioners, which at all times pertinent, were Edwin Humphrey, David Uible, and David Painter.  BCC's duties include making decisions regarding the hiring, firing, compensation, and discipline of Clermont County employees.

{¶ 5}  Based upon the recommendation of the county administrator, BCC frequently convenes executive sessions, which exclude the general public, to discuss personnel matters.  The agenda for an executive session is prepared by BCC's clerk, who does not know the identity of the employees to be discussed when she prepares the agenda.  Neither do the commissioners have foreknowledge of the employee or employees to be discussed

- 2 -

at executive session.

{¶ 6}  Those typically in attendance at executive sessions where personnel matters are discussed include the commissioners, the county administrator, the assistant county administrator, the department head from the department of the employee to be discussed, and someone from the county prosecutor's office.  The meeting attendees do not take official minutes of the executive sessions.

{¶ 7}  As reflected in its public session board minutes, BCC convened executive sessions on February 22, 2017, February 27, 2017, March 1, 2017, March 22, 2017, March 27, 2017, April 19, 2017, June 7, 2017, August 2, 2017, and August 9, 2017 (hereinafter collectively referred to as the "Nine Executive Sessions").  In each of those instances, the public minutes reflect that BCC adopted a motion authorizing an executive session to consider "the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee * * *" as provided by R.C. 121.22(G)(1).  The motions for the February 22, 2017 and March 1, 2017 executive sessions also provided that the executive session was for the purpose of considering pending or imminent litigation, as provided by R.C. 121.22(G)(3).

{¶ 8}  There were multiple occasions in 2017 where BCC entered executive session for less than the multiple reasons authorizing the Nine Executive Sessions, e.g., to only consider the discipline of a public employee, to only consider the dismissal of a public employee, to only consider the compensation of a public employee, and so forth.  However, it was common practice for BCC to convene an executive session based upon a motion including the same multiple purposes included in the motions authorizing the Nine Executive Sessions.

{¶ 9}  Commissioner Uible explained that the practice of including multiple R.C. 121.22(G)(1) purposes in the motion authorizing an executive session was generally utilized

because all of those purposes were relevant to the employees being reviewed. Commissioner Uible testified that he would assume that the commissioners were discussing more than one employee when dismissal, discipline, promotion, and demotion were all considered in one executive session, as BCC would not simultaneously promote and dismiss or demote an individual employee. Commissioner Humphrey testified that when BCC moved into executive session and listed more than one reason for doing so, it was because the commissioners "could" have discussed multiple employees in that session. Commissioner Painter testified that in a single session, BCC might discuss three or four employees, and that "almost every time" more than one employee was involved.

{¶ 10} Regarding the Nine Executive Sessions, Commissioner Uible testified that he assumed the commissioners discussed more than one employee during the February 22, 2017 executive session. However, he did not claim that they "discussed every single one of these things" [included in the authorizing motion] in the executive session." He could not recall what the commissioners discussed concerning pending or imminent litigation. He could not recall anything discussed during that session. Similarly, the other two commissioners could not recall the employee or employees discussed during the February 22, 2017 session. Commissioner Painter could not recall whether there were threats of litigation or pending suits. Then assistant county administrator Eigel could not recall which employee or employees were discussed and was not sure whether he even attended the session.[1] Neither the commissioners nor its administrative staff could relate who or what was discussed during the February 27, 2017, March 22, 2017, March 27, 2017, April 19, 2017, June 7, 2017, August 2, 2017, and August 9, 2017 executive sessions.

{¶ 11} During the March 1, 2017 executive session, the commissioners discussed

---

1. Eigel was an assistant county administrator during some relevant events in this case, and subsequently became the county administrator.

county employee D.R.  However, Commissioner Uible could not recall what was discussed with respect to D.R.  He did not believe they could have discussed both promoting and demoting D.R.  He did not recall any other employees who were discussed during this session.  Commissioner Painter could not recall what was discussed concerning D.R.  He believed that promotion or demotion could have been discussed if D.R. was being moved into a different position and then some other employee would be promoted or demoted to take D.R.'s position.  Humphrey wrote D.R.'s name and "fitness for duty" in personal notes he kept during executive sessions.  Humphrey's notes also indicated "conveyance fees," which he testified related to ongoing litigation.

{¶ 12} Finally, Hicks did not know what transpired during any of BCC's executive sessions.

### Summary Judgment Decision

{¶ 13} Upon consideration of the parties' motions for summary judgment, the trial court rendered summary judgment in BCC's favor upon Hicks' claim that BCC had failed to maintain proper meeting minutes.  However, the trial court granted summary judgment in Hicks' favor upon his improper executive sessions claim based upon the Nine Executive Sessions.  Finally, the trial court found that genuine issues of material fact remained as to Hicks' claim that BCC had conducted an improper private discussion of public business.  Later, Hicks agreed to vacate trial upon this remaining unresolved issue.

{¶ 14} In rendering summary judgment in Hicks' favor as to the Nine Executive Sessions, the trial court applied the burden-shifting framework for OMA claims set forth by this court in *State ex rel. Hardin v. Clermont Cty. Bd. of Elections*, 12th Dist. Clermont Nos. CA2011-05-045 and CA2011-06-047, 2012-Ohio-2569.  The trial court found that Hicks met his initial burden of production under *Hardin* by submitting evidence that the Nine Executive Sessions were meetings from which the public was excluded.  The trial court then noted

that the burden shifted to BCC to come forward with evidence that the challenged meetings fell within one of the statutory exceptions to public meetings. The trial court found that for almost every challenged executive session, neither the commissioners nor Eigel could recall who or what was actually discussed during the executive session. Instead, the commissioners spoke generically about what "typically, usually, or almost always" happens during executive sessions when they consider the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of one or more public employees. With regard to the March 1, 2017 executive session, the court found that although BCC was able to identify D.R. as an employee discussed during that session, the reasons set forth for entering executive session were contradictory to discussing a single employee, that is, they would not be discussing both promoting and demoting a single employee.

{¶ 15} Accordingly, the court found that BCC had not met its burden of producing evidence that the Nine Executive Sessions fell within the statutory exceptions to public meetings, that BCC's conduct therefore violated R.C. 121.22(G)(1), and that that summary judgment should be granted in Hicks' favor.

**Attorney Fees**

{¶ 16} Following the summary judgment decision, Hicks applied for statutory attorney fees. BCC opposed the application, contesting the reasonableness of the hourly rates charged by Hicks' attorneys, as well as the time they spent on the case. BCC also contested block-billed time entries on attorney billing records and argued that Hicks' attorney fee award should be reduced by two thirds because he was successful on only one of three OMA claims.

{¶ 17} After the matter was fully briefed and argued, the court issued a decision awarding Hicks $79,676.77, which was approximately $5,000 less than he requested. That reduction was based upon the court striking some block-billed time entries that contained

redactions. The court further partially reduced some time entries that the court found would have necessarily contained work related to the two unsuccessful OMA claims. BCC appeals, raising two assignments of error.

{¶ 18} Assignment of Error No. 1:

{¶ 19} THE TRIAL COURT ERRED BY PUTTING THE BURDEN ON THE BOARD TO PROVE THAT A VIOLATION OF THE OPEN MEETINGS ACT DID NOT OCCUR, WHERE THE BOARD ESTABLISHED THAT [IT] PROPERLY VOTED TO GO INTO EXECUTIVE SESSION FOR REASONS PERMITTED UNDER R.C. § 121.22(G)(1) AND APPELLEE PRESENTED NO EVIDENCE THAT DELIBERATIONS WERE HELD ON ANY OTHER TOPIC.

{¶ 20} BCC contends that the court erred in finding that it violated OMA where it submitted undisputed evidence that it convened executive session for reasons permitted under R.C. 121.22(G)(1) and Hicks failed to produce evidence that the exceptions claimed by BCC were invalid.

{¶ 21} An appellate court reviews a trial court's decision to grant or deny summary judgment de novo, without any deference to the trial court's judgment. *Robinson v. Cameron*, 12th Dist. Butler No. CA2014-09-191, 2015-Ohio-1486, ¶ 10. Summary judgment is proper when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion which is adverse to the nonmoving party. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). The moving party bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once this burden is met, the nonmoving party has a reciprocal burden to set forth specific facts showing there is some genuine issue of material fact yet

remaining for the trial court to resolve. *Id.* In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party. *Walters v. Middletown Properties Co.,* 12th Dist. Butler No. CA2001-10-249, 2002-Ohio-3730, ¶ 10.

{¶ 22} The Open Meetings Act, set forth in R.C. 121.22, seeks to prevent public bodies from engaging in secret deliberations on public issues with no accountability to the public. *Hardin*, 2012-Ohio-2569 at ¶ 14. The statute is to be "liberally construed" to require public officials to take official action and conduct deliberations upon official business only in open meetings unless the subject matter is specifically excepted. R.C. 121.22(A). Likewise, R.C. 121.22(C), specifies that "[a]ll meetings of any public body are declared to be public meetings open to the public at all times." In essence, OMA mandates that public bodies deliberate public issues in public. *State ex rel. Chrisman v. Clearcreek Twp.*, 12th Dist. Warren No. CA2012-08-076, 2013-Ohio-2396, ¶ 10. As a "legislative authority," "commission," and "board" of a county, BCC is a "public body" under OMA and subject to its provisions. R.C. 121.22(B)(1)(a).

{¶ 23} Public officials may discuss certain sensitive information privately in an executive session. *Hardin* at ¶ 15. An executive session "'is one from which the public is excluded and at which only such selected persons as the board may invite are permitted to be present.'" *Id*. quoting *Thomas v. Bd. of Trustees of Liberty Twp.*, 5 Ohio App.2d 265, 268 (7th Dist.1966). R.C. 121.22(G) lists the matters that a public body may consider in executive session. The exceptions to public meetings contained in R.C. 121.22(G) are to be strictly construed. *In re Removal of Kuehnle*, 161 Ohio App.3d 399, 2005-Ohio-2373, ¶ 93 (12th Dist.).

{¶ 24} Relevant to this appeal is the exception contained within R.C. 121.22(G)(1). The exception provides, in relevant part, that a public body may convene an executive

session:

> To consider the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official * * * If a public body holds an executive session pursuant to division (G)(1) of this section, the motion and vote to hold that executive session shall state which one or more of the approved purposes listed in division (G)(1) of this section are the purposes for which the executive session is to be held, but need not include the name of any person to be considered at the meeting.

Consistent with this statutory language, we have construed this section to require a public body to "specify, in detail, the stated purpose for holding an executive session, although the law does not require that the specific nature of the matter to be considered be disclosed." *Kuehnle* at ¶ 93.

{¶ 25} In *Hardin*, this court addressed the burden of proof in cases alleging OMA violations. We recognized that the individual seeking injunctive relief has the burden of proof. 2012-Ohio-2569 at ¶ 22, citing *State ex rel. Stern v. Butler*, 7th Dist. Jefferson No. 98-JE-54, 2001 WL 1155821 (Sept. 26, 2001); *State ex rel. Sigall v. Aetna Cleaning Contrs. of Cleveland, Inc.*, 45 Ohio St.2d 308 (1976). We continued by observing:

> The term "burden of proof" is a composite burden that "encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of persuasion." *Chari v. Vore*, 91 Ohio St.3d 323, 326, 744 N.E.2d 763 (2001). "The term 'burden of production' tells a court which party must come forward with evidence to support a particular proposition, whereas 'burden of persuasion' determines which party must produce sufficient evidence to convince a judge that a fact has been established." 29 American Jurisprudence 2d, Evidence, Section 171 (2012). "The burden of persuasion never leaves the party on whom it is originally cast." *Id.* Thus, what shifts is "the burden of going forward with the evidence, rather than the actual burden of proof. The burden which rests upon the plaintiff, to establish the material averments of his or her cause of action * * *, never shifts." 42 Ohio Jurisprudence 3d, Evidence and Witnesses, Section 84 (2012).

*Id.* at ¶ 23.

{¶ 26} Premised on these concepts, this court held that the relator alleging an OMA violation has the ultimate burden, that is, the burden of persuasion, to prove OMA was violated (or was threatened to be violated) by a public body. *Id.* at ¶ 24. That burden of persuasion never leaves the relator. *Id.*

{¶ 27} The relator "initially carries his or her burden by showing that a meeting of the majority of the members of a public body occurred and that the general public was excluded from that meeting." *Id.* at ¶ 25. Once the relator makes this initial showing, the burden shifts to the public body to "produce or go forward with evidence that the challenged meeting fell under one of the exceptions of R.C. 121.22(G)." After the public body comes forward with such evidence, the burden then shifts to the plaintiff or relator to come forward with evidence that the exception claimed by the public body is not applicable or not valid. *Id.*

{¶ 28} This appeal centers on what evidence the public body must produce to satisfy its obligation under *Hardin.* BCC contends that it meets its burden of production under *Hardin* by proof that it convened, or motioned into an executive session for permissible R.C. 121.22(G)(1) purposes. BCC argues that the trial court erroneously concluded that *Hardin's* framework required it to provide additional evidence of what was actually discussed during executive session.

{¶ 29} Specifically, BCC asserts that it satisfied its burden of production under *Hardin* because its public session meeting minutes reflect that it convened the Nine Executive Sessions for proper R.C. 121.22(G)(1) purposes. Acknowledging that multiple permissible (G)(1) purposes were identified in the motions authorizing the Nine Executive Sessions, BCC argues that this was done because the evidence showed that BCC often discussed multiple employees during these executive sessions. Additionally, as BCC asserted in its appellate brief, because the commissioners did not know beforehand which specific employees would be discussed "they sometimes include all of the grounds under [R.C.

121.22(G)(1)] to make sure that they are covered for all employment-related discussions that may arise during executive session."

{¶ 30} In *Hardin*, this court noted the dual aspects of a public body's compliance with OMA. We held that, "[a]s long as an executive session is properly convened for the sole purpose of considering certain specified matters under R.C. 121.22(G), *and the deliberations during the executive session are for a purpose specifically authorized under R.C. 121.22(G)*, there is no violation of OMA." (Emphasis added.) 2012-Ohio-2569 at ¶ 55, citing R.C. 121.22(G), (H). Consistent with this holding, the court in *Hardin* considered evidence of what occurred in executive session in determining the existence of an OMA violation. *Id.* at ¶ 57-62.

{¶ 31} Likewise, the court in *Keystone Commt. v. Switzerland of Ohio Sch. Dist. Bd. of Edn.,* 7th Dist. Monroe No. 15 MO 0011, 2016-Ohio-4663, ¶ 27, held that there are "two separate issues" in analyzing a public body's compliance with R.C. 121.22(G). "The first is whether the Board went into executive session for a legally permissible purpose. The second is whether any impermissible deliberations on public topics took place during executive sessions." *Id.*

{¶ 32} BCC contends that it should be Hicks' burden under *Hardin* to come forward with evidence that the executive session deliberations were noncompliant with OMA. However, *Hardin* was clear that BCC bears the burden of production that the "the challenged *meeting* fell under one of the exceptions of R.C. 121.22(G)." (Emphasis added.) *Hardin* at ¶ 25. Thus, consistent with *Hardin's* recognition of the dual aspects of OMA compliance, its burden-shifting scheme requires a public body to produce evidence that the discussions during the executive session complied with R.C. 121.22(G) and were consistent with the motion authorizing the executive session.

{¶ 33} It is both logical and consistent with the statutory purpose of OMA to place

this burden on the public body rather than the relator. First, the legislative intent behind OMA is that public bodies conduct their business publicly. The statute is required to be "liberally construed" in favor of open meetings. R.C. 121.22(A). Furthermore, exceptions to the requirement that meetings be open to the public must be strictly construed against the public body. *See Hardin* at ¶ 15, *Kuehnle* at ¶ 93.

{¶ 34} Second, *Hardin* and *Keystone*'s recognition that compliance with OMA involves consideration of discussions during executive session is also consistent with the language of R.C. 121.22(G), which specifies that an executive session is for the "sole purpose" of the "consideration" of the permissible subjects set forth in the statute. Thus, even where a public body properly convenes an executive session, compliance with OMA requires that the public body "consider" only those specified matters while in executive session.

{¶ 35} Third, the public body is in a much better position to produce evidence demonstrating that its executive session complied with OMA. Such evidence is exclusively in the possession of the public body and subject to its control. On the other hand, it is unrealistic to believe that a relator could produce evidence that the public body engaged in impermissible deliberations during an executive session in which the relator was not an attendee. In such a case, a relator could only establish an OMA violation where the public body shares such evidence with the relator, or an insider admits to improper conduct.

{¶ 36} Fourth, holding that the public body can meet its burden of production as to both aspects of OMA compliance under *Hardin* simply by producing minutes reflecting that it moved into executive session for a permissible purpose, begs the question. The motion authorizing an executive session is not evidence that the discussions during the executive session were consistent with that motion.

{¶ 37} Here, BCC, through its public session board minutes, came forward with

evidence that it convened executive session for permissible purposes. Thus, BCC has established the first aspect of its burden of production. However, as set forth above, BCC was additionally required to produce evidence that the discussions during the challenged meetings fell under one of the exceptions of R.C. 121.22(G) and were consistent with the motion authorizing the executive session. With the exception of the March 1, 2017 meeting, no commissioner or BCC staff could recall the content of any discussions during those executive sessions. And BCC was unable to produce any other evidence of what occurred during those sessions.

{¶ 38} The March 1, 2017 executive session differed from the others only in the respect that BCC was able to identify a single employee who was discussed. BCC could not say whether D.R. was the only employee discussed during the meeting. None of the three county commissioners could recall what they discussed concerning D.R., i.e., whether it was to discuss appointment, employment, dismissal, discipline, promotion, demotion, or compensation. Commissioner Uible agreed that it would be "contrary" to discuss both promoting and demoting D.R. He also could not recall any other employees discussed during the session. Commissioner Painter's testimony was that he believed that they *could* have been discussing both promoting and demoting if D.R. was being moved to a different position and some other employee would then be promoted or demoted to take D.R.'s position. But Commissioner Painter was unsure whether BCC was discussing promoting, demoting, terminating, or hiring D.R. Thus, as found by the trial court, even if the evidence was construed to show that the commissioners discussed demoting, dismissing, or disciplining D.R., there was no evidence that the commissioners discussed appointing, employing, or promoting another employee to take D.R.'s position as provided in the motion convening the March 1, 2017 executive session.

{¶ 39} Moreover, the March 1, 2017 executive session was also convened to confer

with the prosecuting attorney regarding pending or imminent litigation pursuant to R.C. 121.22(G)(3). The only evidence presented that possibly related to "pending or imminent litigation" were personal notes taken by Commissioner Humphrey, that may or may not have been taken during executive session. Those notes briefly referred to a "rear end" accident by a county deputy and "conveyance fees." There was no evidence presented to connect these remarks to pending or imminent litigation discussed by the commissioners and a county prosecutor during the session. To that end, there was no evidence presented indicating that a county prosecutor or other legal counsel even attended the session as is required by R.C. 121.22(G)(3).

{¶ 40} The inability to produce any evidence of what was considered during the Nine Executive Sessions – whether it be by a claimed lack of memory or lack of adequate record-keeping – does not satisfy BCC's burden of production to show that the challenged meetings fell under one of the exceptions of R.C. 121.22(G) and was consistent with the motion to convene executive session. To hold that a board can demonstrate compliance with OMA by properly motioning into executive session and then expressing a lack of memory of the matters discussed would effectively turn *Hardin's* burden-shifting framework on its head and eviscerate the OMA.

{¶ 41} Additionally, the trial court could have been justified in finding OMA violations based upon BCC's admission that it listed multiple purposes under (G)(1) to ensure that it was "covered for all employment-related discussions." This procedure is noncompliant with OMA, which requires the public body, when listing those exceptions under R.C. 121.22(G)(1), to state "which one or more of the approved matters listed in those divisions *are to be considered* at the executive session." (Emphasis added.) The case law as it existed at the time also expressly forbid this practice. *State ex rel. Long v. Council of the Village of Cardington*, 92 Ohio St.3d 54, 59 (2001) (holding that a public body that decides

to conduct executive session "must specify in its motion and vote those listed matters that it will discuss in the executive session"); *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 185 Ohio App.3d 707, 2009-Ohio-6993, ¶ 64 (10th Dist.) (holding that executive session may be held "'for the sole purpose of the consideration of' one of the enumerated exceptions.") *Kuehnle* at ¶ 93; *Keystone*, 2016-Ohio-4663 at ¶ 26. In this regard, the record is clear that BCC did not list multiple purposes in a good faith belief that all those subjects would be discussed. On the contrary, because the county commissioners had no foreknowledge of what would be discussed, multiple purposes were listed to cover all possible subjects of discussion.

{¶ 42} BCC argues that the trial court's decision, if permitted to stand, would require public bodies to reveal the "substance" of what was discussed during an executive session and undermine the public policy embodied in R.C. 121.22(G) authorizing executive sessions. However, the OMA expressly provides that "[t]he minutes need only reflect the general subject matter of discussions in executive sessions authorized under division (G) or (J) of this section." R.C. 121.22(C). Thus, the General Assembly has afforded public bodies with a means to maintain the confidentiality of executive session discussions while generally memorializing that their discussions complied with OMA. For whatever reason, BCC did not exercise its option to keep general minutes of its executive sessions. To the extent that BCC has concerns over confidentiality of executive session discussions in the midst of defending OMA claims, protective orders are commonly used by litigants to preserve the confidentiality of sensitive matters. A trial court is well positioned to address those concerns and tailor appropriate discovery orders.

{¶ 43} BCC also argues that it is prejudiced by the passage of time and fading memories in cases asserting OMA violations. However, this argument is refuted, again by R.C. 121.22(C) permitting public bodies to keep general minutes of executive sessions and

R.C. 121.22(I), which requires actions alleging OMA violations or threatened violations to be brought within two years.

{¶ 44} Finally, BCC cites *State ex rel. Ames v. Portage Cty. Bd. of Commrs.*, 11th Dist. Portage No. 2019-P-0015, 2019-Ohio-3729, for the proposition that a public body meets its burden of production under *Hardin* by reciting permissible reasons to enter executive session under R.C. 121.22(G)(1). There, the court held that when the board of county commissioners recited R.C. 121.22(G)(1) prior to entering into executive session, it met its burden of production and the burden then shifted back to the relator to come forward with evidence that R.C. 121.22(G)(1) was not applicable or valid. *Id.* at ¶ 73.

{¶ 45} The opinion in *Ames* dealt only with the first aspect of a public body's compliance with OMA because the relator there had complained that the public body failed to comply where it "read from R.C. 121.22(G)(1) and stated all permissible purposes set forth in the statute without specifying which of those permissible purposes would be discussed." *Id.* at ¶ 8. *Ames* did not involve, and the court of appeals did not discuss, the subject of the discussions during executive session. In this case, Hicks' challenge involved both aspects of compliance with OMA.

{¶ 46} This case does not call upon us to prescribe the detail necessary for a public body to demonstrate that its executive session discussions complied with OMA. We need only decide whether the evidence produced by BCC here demonstrated such compliance. Being mindful that this court must liberally construe the statute in favor of open meetings and that the exceptions to open meetings are to be strictly construed against the public body, we find that BCC failed to produce evidence that its discussions during the Nine Executive Sessions were consistent with the authorizing motions. Accordingly, BCC failed to satisfy its burden of production under *Hardin*. For the foregoing reasons, this court overrules BCC's first assignment of error.

{¶ 47} Assignment of Error No. 2:

{¶ 48} THE TRIAL COURT ERRED IN GRANTING APPELLEE'S APPLICATION FOR ATTORNEY'S FEES.

{¶ 49} BCC contends that the court erred in awarding Hicks attorney fees for time entries that were block billed and for OMA claims that he failed to prove. BCC further argues that the trial court erred in granting Hicks any attorney fees because a well-informed public body in its place would have reasonably believed that it was not violating or threatening to violate OMA.

{¶ 50} OMA contains a fee-shifting provision under R.C. 121.22(I)(2) that authorizes an award of reasonable attorney fees to the individual establishing an OMA violation. A trial court's determination as to whether to award attorney fees under R.C. 121.22(I)(2) is a discretionary matter. *Wheeling Corp. v. Columbus & Ohio River RR. Co.*, 147 Ohio App.3d 460, 479 (10th Dist.2001). An appellate court will not reverse a lower court's decision to award attorney fees unless the decision indicates that the court's reasoning or attitude was unreasonable, arbitrary, or unconscionable. *Taylor v. McCullough-Hyde Mem. Hosp.*, 116 Ohio App.3d 595, 600 (12th Dist.1996).

{¶ 51} When calculating attorney fees, a trial court is guided by a two-step determination. The court should first calculate the "lodestar" amount by multiplying the number of hours reasonably expended by a reasonable hourly rate and, second, decide whether to adjust that amount based on the factors listed in Prof.Cond.R. 1.5(a). *Levy v. Seiber*, 12th Dist. Butler Nos. CA2015-02-019, CA2015-02-021, and CA2015-02-030, 2016-Ohio-68, ¶ 67.

{¶ 52} Hicks requested $82,358.07 in attorney fees and submitted his attorneys' billing records and affidavits, and an affidavit attesting to the reasonableness of the hourly

rates charged and time spent on the case.[2]   In opposition, BCC challenged both the reasonableness of the hourly rates and the time expended on the case.  BCC also argued that Hicks should not be awarded attorney fees for claimed OMA violations that he did not prove and for attorney time that was block billed.  Based on these arguments, BCC asked the court to award Hicks $10,774.50.

{¶ 53} BCC subsequently requested that the court lower Hicks' attorney fee award to zero.  The basis of the argument was R.C. 121.22(I)(2)(a), which permits a court, in its discretion, to reduce an award of attorney fees if the court determines that a "well-informed public body" would reasonably believe that it was not violating OMA and that it would believe that its conduct was serving the public policy underlying OMA.

{¶ 54} In its decision, the court found that Hicks' attorneys' hourly rates were reasonable, as was the time they expended on the case.  The court found that while block billing was disfavored, those items that were blocked billed related to the successful OMA claim and were not so extensive as to "give the court pause."  In this regard, the court noted that most block-billed entries contained two tasks, as opposed to long paragraphs describing numerous tasks.  However, the court determined that it would strike three block-billed entries that contained portions marked "[REDACTED]."  The court noted that the combination of block billing and redactions made it too difficult to determine the reasonableness of the fee request.

{¶ 55} The court next addressed BCC's argument that Hicks' fee request should be reduced by two thirds because he was not successful on all his claimed OMA violations.  In rejecting this argument, the court noted that Hicks' attorneys had already removed billing entries that related exclusively to the unsuccessful OMA claims.  The court also observed

---

2. Hicks later requested an additional $2,450 for attorney time incurred while defending the attorney fee application.

that the executive sessions claim was more labor intensive and detailed than the other claims, which involved "substantially less discovery and briefing than the former." The court found that most of the time entries submitted involved issues that were inextricably intertwined with the successful claim and would have been incurred with or without the non-meritorious claims.

{¶ 56} However, the court determined it would reduce the fee award to account for the portion of attorney time spent drafting pleadings or filings that would have involved the two meritless claims. Accordingly, the court reduced the award with respect to a percentage of the time spent by Hicks' attorneys in drafting the complaint, motion for summary judgment, and memorandum in opposition to BCC's motion for summary judgment.

{¶ 57} Finally, the court rejected BCC's argument that the award should be reduced to zero because BCC reasonably believed it was not violating OMA. The court found that case law explained that a public body must be specific, and not convoluted, concerning executive sessions entered under R.C. 121.22(G). Based on the foregoing analysis, the court reduced Hicks' fee request by $5,131.30 and awarded his attorneys $79,676.77.

{¶ 58} We first address BCC's argument with regard to "block billing," which, in attorney invoicing, involves the practice of listing multiple tasks in a single paragraph followed by the total amount of time spent on all tasks. *Sims v. Nissan N. Am., Inc.*, 10th Dist. Franklin No. 15AP-19, 2015-Ohio-5367, ¶ 30. Block billing is disfavored by both clients and courts, as it makes it difficult, if not impossible, to determine the reasonableness of a fee request. *State ex rel. Harris v. Rubino*, 156 Ohio St.3d 296, 2018-Ohio-5109, ¶ 6, citing *Tridico v. Dist. of Columbia*, 235 F.Supp.3d 100, 109 (D.D.C.2017).

{¶ 59} Because of concerns over block-billing, the Ohio Supreme Court determined that:

> *this court* will no longer grant attorney-fee applications that

> include block-billed time entries. Future fee applications submitted to *this court* should contain separate time entries for each task, with the time expended on each task denoted in tenths of an hour. Applications failing to meet these criteria risk denial in full.

(Emphasis added.) *Id.* at ¶ 7. The language employed in *Rubino* seems to announce a de facto rule of practice for the Ohio Supreme Court. Thus, we do not construe *Rubino* as establishing a categorical rule applicable to all courts of Ohio precluding an award of reasonable attorney fees that are block-billed. *See id.; State ex rel. Kesteron v. Kent State University*, 156 Ohio St.3d 22, 2018-Ohio-5110, ¶ 36; *accord Christen v. Continental Enterprises, Ltd.*, 8th Dist. Cuyahoga No. 108736, 2020-Ohio-3665, ¶ 46-47 (holding that *Rubino* did not preclude an award of fees based on block-billed time entries).

{¶ 60} This court shares the Ohio Supreme Court's concerns over fee requests and block billing. We also recognize that experienced trial judges who are familiar with attorney billing and litigation practice may determine that the tasks described in block-billed entries and the total time expended on all tasks was reasonable, as the trial court did in this case. However – and we caution trial judges – if attorney fees are awarded based upon block-billed entries, they should articulate the factors upon which the fees were determined to be reasonable despite having been block-billed.

{¶ 61} As noted by the court, where block billing occurred, it was often limited to a few tasks or less, and was never so extensive that the court was concerned as to the reasonableness of the fee request. The one example of excessive block billing cited by BCC in its brief consists of five different tasks, including composing multiple e-mails and a demand correspondence to opposing counsel. However, the total time expended on all five tasks was less than one hour of attorney time. Those time entries that were block billed for a greater amount of attorney time appear consistent with the work described. Accordingly, in this case, we cannot find that the court abused its discretion in awarding Hicks fees for

certain block-billed time entries.

{¶ 62} This court also finds no abuse of discretion in the trial court's decision not to reduce the fee award by two thirds based on the argument that Hicks only succeeded on one of three claims. The court's rationale was sound, i.e., the time entries related exclusively to the unproven OMA claims were already removed but it would reduce, by a percentage, those time entries involving the drafting of pleadings or filings where Hicks would have had to contribute some work towards advancing those unsuccessful claims. In addition, the court found that the majority of work on the case was related to the successful claim. The court's approach was far less arbitrary than BCC's argument that the entire fee application should be reduced by two thirds based simply upon the number of claims involved in the case, rather than the work attributable to each claim. The lower court is in a far better position than this court to determine the effort put forth by counsel on a specific claim and we will not second-guess that judgment.

{¶ 63} Finally, BCC argues that the court should have reduced the attorney fee award to zero based on the application of R.C. 121.22(I)(2)(a), which provides:

> If the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court shall order the public body that it enjoins to pay * * * subject to reduction as described in division (I)(2) of this section, reasonable attorney's fees. The court, in its discretion, may reduce an award of attorney's fees to the party that sought the injunction or not award attorney's fees to that party if the court determines both of the following:
>
> (i)   That, based on the ordinary application of statutory law and case law as it existed at the time of violation or threatened violation that was the basis of the injunction, a well-informed public body reasonably would believe that the public body was not violating or threatening to violate this section;
>
> (ii)  That a well-informed public body reasonably would believe that the conduct or threatened conduct that was the basis of the injunction would serve the public policy that underlies the authority that is asserted as permitting that conduct or threatened conduct.

Thus, a court, in its discretion, may reduce or eliminate an award of attorney fees *only* if the court finds both that a well-informed body in the position of BCC would reasonably believe that it was not violating OMA *and* that it would reasonably believe that its conduct would serve the public policy set forth in OMA.

{¶ 64} BCC argues that it had a reasonable belief that it could recite multiple permissible reasons under R.C. 121.22(G)(1) when it motioned into executive session because it often considered multiple employees and did not know what specific matters it might need to discuss concerning those employees. As described in response to the first assignment of error, this argument is meritless. R.C. 121.22(G)(1) unambiguously informs a public body that if it "holds an executive session pursuant to division (G)(1) of this section, the motion and vote to hold that executive session shall state which one or more of the approved purposes listed in division (G)(1) of this section *are the purposes* for which the executive session is to be held * * *." (Emphasis added.) From this language as well as the case law previously cited, BCC should have known that it must be specific when describing the reasons for moving into executive session instead of perfunctorily covering all possibilities.

{¶ 65} BCC attempts to excuse its failure to comply with R.C. 121.22(G)(1) because the commissioners did not know the identity of those employees who would be discussed, and often multiple employees were discussed. However, the fact that the commissioners may not have known which employees were the subject of the session, and what topics may be discussed relative to an employee or employees is an administrative deficiency and has no effect on whether BCC could reasonably believe that it was complying with the OMA.

{¶ 66} Finally, BCC makes no argument as to how its practice of listing multiple R.C. 121.22(G)(1) purposes before moving into executive session would serve the policy purposes of the OMA. Given that the OMA is primarily concerned with the openness of the

meetings of public bodies, there can be no legitimate argument made by BCC that this conduct, which necessarily obfuscated the content of considerations in executive session, served the public purpose underpinning the OMA.  For the foregoing reasons, this court overrules BCC's second assignment of error.

{¶ 67}  Judgment affirmed.

HENDRICKSON, J., concurs.

PIPER, P.J., dissents.

**PIPER, P.J., dissenting.**

{¶ 68}  I respectfully dissent.  Hicks admitted he lacked any knowledge of what occurred during the BCC's executive sessions and, with the exception of the June 7, 2017 executive session, failed to offer any evidence that the BCC violated the OMA.[3] Nonetheless, the majority opinion concludes that Hicks need not meet his ultimate burden to prove an OMA violation.  My colleagues find that although the BCC established it went into executive session for permissible purposes, it could not "additionally" offer proof regarding the content of its actual deliberations.  *See* ¶ 37 above.  The majority has transformed *Hardin* into a new, unworkable framework, which emphasizes the burden-shifting procedure for coming forward or producing evidence over substantive evidence. This goes against the clear statutory purpose of the OMA.

### Creation of Presumptive OMA Violation

---

3. As will be addressed in greater detail below, I would find that Hicks submitted some circumstantial evidence that may suggest that the BCC engaged in improper deliberations on June 7.  Any discussion in this dissent as to the lack of evidence submitted by Hicks establishing an OMA violation is with reference to the other eight executive sessions.

{¶ 69} In this new blueprint, the relator no longer has the burden of proof. The majority creates what is effectively a presumptive OMA violation that arises any time a public body convenes an executive session. Without expressly saying so, my colleagues place the burden upon the public body to *disprove* the presumptive violation. Only after the public body rebuts the presumption – by coming forward with the content of discussions otherwise intended by the legislature to remain confidential – does the burden shift back to the relator.[4]

{¶ 70} As illustrated by this case, Hicks filed a complaint without a scintilla of evidence with respect to what occurred during the BCC's executive sessions. Instead, he merely suspected a violation because, on some occasions during 2017, the BCC listed multiple statutorily-permissible reasons for entering executive session. However, all of those reasons listed by the Board were *proper* statutory reasons to enter executive session. Even so, the majority opinion presumes that the BCC did not actually consider those topics, that it ignored its duties, and that its deliberations violated the OMA. The majority opinion places a mandatory duty upon the BCC to produce additional evidence disproving an OMA violation. This mandatory duty can only be satisfied by producing specific evidence of the discussions that took place in every challenged executive session. *See* ¶ 32 above. This blueprint is not supported by any provision of the OMA.

{¶ 71} The brief mention in the majority opinion, that the BCC conducted executive sessions on some occasions where less than all of the (G)(1) exceptions were listed, is noteworthy. This lends credence to the conclusion that the BCC was purposeful in describing its reasons for entering executive session. Circumstantially, the evidence

---

4. Hicks, in the summary judgment proceedings, conflated the burden of proof with the burden of production and argued to the trial court that the BCC had the burden of proof. I respectfully note the trial court and my colleagues were misdirected by Hicks' confusion, thus negating that Hicks always had the burden of proof. *Hardin* at ¶ 24.

presented led to a reasonable inference that the BCC's recitation of multiple (G)(1) purposes was intended on each occasion because the BCC anticipated it would discuss those topics during those executive sessions. Ordinarily, public officials are considered truthful and committed to following the law, unless proven otherwise. This notion should not be derailed by a judicially-created presumption of irregularity that public officials must now disprove.[5]

**Culpability Due to an Inability to Disprove**

{¶ 72} Despite Hicks having no evidence in support of his challenge to eight executive sessions, he benefits from the majority's presumptive OMA violation. Ironically, a relator can now establish a violation and obtain attorney fees simply by producing a copy of the public session meeting minutes reflecting that the public body convened executive session for proper purposes. To be clear, neither Hicks nor the BCC submitted any evidence that would even remotely suggest an OMA violation as to the eight sessions. It is only the BCC's inability to disprove the majority's presumptive OMA violation that has resulted in the finding of an OMA violation.

{¶ 73} The majority is forcing the hand of every public body in this district to begin keeping minutes or records as to the content of its executive sessions to overcome the presumption. Notably, the majority opinion declines to specify the level of detail necessary for a public body to disprove an OMA violation, instead merely concluding that the BCC failed to prove compliance with the OMA. *See* ¶ 46 above.

{¶ 74} This new documentation requirement will create public records under R.C.

_____

5. The majority disregards evidence circumstantially suggesting that the BCC *was* compliant with the OMA when it concludes that a vehicular rear-end collision involving a county deputy is not a topic involving imminent litigation. *See* ¶ 39 above. My colleagues would also require that the BCC produce evidence that a legal representative was present during meetings to discuss pending litigation. The OMA does not require such additional evidence and Hicks, who has the burden of proof, never produced any information that a legal representative was not present.

149.43, which would eviscerate the confidentiality that the General Assembly purposefully created and specifically tailored for executive sessions. As intended by the General Assembly, public bodies have legitimate reasons to discuss those specified topics in complete confidence. Thus, the failure to keep records as to the content of executive session topics is not an "administrative deficiency," as suggested by my colleagues in ¶ 65 above. The majority opinion also indicates that a party may seek a protective order to maintain the confidence of executive session materials. However, a protective order in OMA litigation would not prevent any person from simply making an independent public records request under R.C. 149.43(B).

### The OMA Permits Consideration of Multiple Exceptions in Executive Session

{¶ 75} Despite this being a review of summary judgment proceedings, my colleagues evaluate the testimony and make credibility determinations that even the trial court did not make. The majority concludes that the BCC was acting to "obfuscate" and did not act in "good faith" when it listed multiple employment topics prior to entering executive session. *See* ¶ 41 and 66 above. However, even if one were to find the BCC's explanation unacceptable, there is no evidentiary basis for concluding that the BCC acted in bad faith. And the conclusion that the Board was attempting to conceal anything from the public is wholly unsupported and unwarranted.

{¶ 76} There is nothing improper or inconsistent with the BCC, prior to executive session, reasonably anticipating that in discussing personnel matters all of the reasons under R.C. 121.22(G)(1) may be relevant. Furthermore, there is nothing in the OMA statutory language that would indicate it is improper to list multiple (G)(1) reasons. From a rational perspective, if the public body meets to discuss employee discipline, then dismissal or demotion are both potential topics of discussion. If dismissal or demotion may be

discussed, it is only reasonable that the public body would also discuss promoting, appointing, or employing a new individual, along with other necessary related topics. Of course, compensation would be a subject of discussion in almost all changes involving employees.

{¶ 77} Nothing is improper or unreasonable about the BCC's explanation that it *sometimes* listed multiple purposes to discuss various employment related matters ensuring that it was covered for all potential discussions in executive session. My colleagues appear to weigh the testimony when they characterize the BCC's explanation in this regard as simply "meritless." *See* ¶ 64 above. I am compelled to point out that it is not "obfuscating," as the majority suggests, to tell the public that the board will meet to discuss multiple employee matters, which could include employee promotion, demotion, discipline, and the like, in the same setting.

{¶ 78} Furthermore, I respectfully disagree with the majority's citations to *Cardington*, 92 Ohio St.3d 54; *Keystone*, 2016-Ohio-4663; *Tobacco Use*, 2009-Ohio-6993; and *Kuehnle*, 2005-Ohio-2373, to support the argument that listing multiple purposes in a motion to convene executive session is improper. I agree those cases stand for the proposition that a public body must be specific about those statutory exceptions it will discuss. But the cases do not stand for the proposition that a public body cannot list multiple purposes for entering executive session when it intends to discuss those topics. *See Maddox v. Greene Cty. Childrens Servs. Bd. of Dirs.*, 2d Dist. Greene No. 2013-CA-38, 2014-Ohio-2312 at ¶ 18 (noting that other courts have encouraged listing *one or more* of the statutory purposes).

### The BCC's Minutes Complied with the OMA

{¶ 79} The majority is wrong in its assertion that the BCC failed to follow the statutory provision requiring that regular meeting minutes must reflect the "general subject matter" of discussions in executive session. R.C. 121.22(C). To the contrary, that is exactly what the

BCC did here.  For each challenged meeting, the BCC's regular minutes reflected a motion and vote to go into executive session and listed the permissible statutory topics that would be discussed.  By disclosing the statutory topics in its motion, the BCC did in fact describe the "general subject matter" of intended discussions in executive session.

{¶ 80} The majority opinion simply reads the word "general" out of the statute and interprets this provision to mean that the BCC was obligated to keep details of the actual discussions.  *See* ¶ 37-40 above.  I find it illogical that the General Assembly would create a right to discuss certain matters confidentially but mandate that a public body keep details of those confidential discussions.  There is no case law that mandates disclosure of the specific nature of the statutorily-permitted topics actually discussed.  In fact, our precedent, *Kuehnle*, held that the public body is not required to disclose "the specific nature of the matter to be discussed."  2005-Ohio-2373 at ¶ 93.

**Claims Can Be Proven Without a Presumption of Irregularity**

{¶ 81} What occurred in this case contradicts the majority's suggestion that a relator could never prove an OMA violation in the absence of requiring the public body to *first* prove the content of discussions occurring in executive session.  Assumedly, an action alleging an OMA violation must be supported by "good ground[s]."  Civ. R. 11.  Therefore, a relator would ordinarily have some evidentiary support for a violation before filing a complaint. However, in the case where a relator merely suspects a violation, the relator may investigate, perform interviews, obtain affidavits, issue subpoenas, and conduct ordinary discovery efforts to substantiate a violation.

{¶ 82} Hicks undertook extensive written discovery, including interrogatories and requests for production of documents, including e-mails.  He deposed all relevant witnesses.  He uncovered a handwritten note taken by one of the commissioners, possibly during executive session, that could circumstantially indicate that a matter other than those

pertaining to employees was discussed. This handwritten note appears to pertain to the June 7 executive session and is sufficient to prevent summary judgment in the BCC's favor. Thus, while the result of a trial is unknown, it is objectively possible for a trier of fact to find that an OMA violation occurred without the need for a presumptive violation.

**New Precedent in OMA Cases**

{¶ 83} Ultimately, the precedent set today presents a stark contrast with other appellate districts that appropriately recognized that the ultimate burden of proof is on the relator. *Ames*, 2019-Ohio-3730 at ¶ 81 (finding no violation of the OMA because the relator could not identify the portions of the record substantiating an OMA violation); *State ex rel. Huth v. Bolivar*, 5th Dist. Tuscarawas No. 2018 AP 03 0013, 2018-Ohio-3460, ¶ 27 (abiding by the proposition that the party seeking to prove an OMA violation has the ultimate burden of proof); *Brenneman Bros. v. Allen Cty. Commrs.*, 3rd Dist. No. 1-14-15, 2015-Ohio-148, ¶ 18-19 (finding that the relators had the burden to prove that the board acted illegally and finding that the relators offered no evidence that the board acted inappropriately in entering executive session).

{¶ 84} In ignoring that it was Hicks' burden to prove an OMA violation, the trial court and majority opinion treat *Hardin* as a formulaic, burden-shifting mechanism to be followed step by step regardless of the consideration of what substantive evidence was submitted. The majority reinvents *Hardin* to require the BCC to prove what occurred during executive session, yet this always remained Hicks' "ultimate burden." *Hardin*, 2012-Ohio-2569 at ¶ 24.

{¶ 85} This court should have applied *Hardin* as written, finding that Hicks met his initial, minimal burden by offering evidence that the BCC met in executive session. Following that, it should have found that the BCC, through its regular meeting minutes, offered evidence that the meetings challenged by Hicks fell within topics permitted by R.C.

121.22(G), i.e., those exceptions listed in (G)(1), or in some cases, (G)(3). Then, consistent with *Hardin*, the majority should have required Hicks to ultimately come forward with evidence to prove that the topics claimed by the BCC were invalid and that improper deliberations violated the OMA. *Hardin* at ¶ 25.

{¶ 86} The court should have found that Hicks, as to the eight executive sessions, failed to submit *any* evidence sufficient to create a genuine issue of fact as to whether the BCC violated the OMA. With regard to the June 7, 2017 session, Hicks submitted Commissioner Humphrey's handwritten note, which could arguably indicate that the BCC may have discussed county hotels during that executive session. This evidence, when viewed in a light most favorable to Hicks, would be sufficient to create a triable issue of fact as to whether or not the BCC engaged in improper deliberations on that occasion. The weight to be given this potential evidence is a matter for the trier of fact and prevents either party from receiving a favorable summary judgment ruling.

{¶ 87} As to the other sessions, there was no evidence presented by Hicks or anyone else that the exceptions claimed by the BCC were not applicable or valid. While there is no evidence in the record to support that each topic was discussed, it is more significant that there is no evidence that each topic *was not* discussed. Neither was there evidence of any improper deliberations; Hicks, as well as the majority, cite to none.

{¶ 88} In sum, I believe that the majority opinion constructs a presumptive OMA violation that is supported neither by the language of the statute, nor *Hardin*, nor the case law discussing this subject. The bottom line is that Hicks had the ultimate burden of proof in these summary judgment proceedings. He failed to offer any evidence that could be used to argue an OMA violation in the eight executive sessions. On the other hand, the BCC offered evidence that it convened executive session for statutorily permitted purposes. Accordingly, I would reverse summary judgment in Hicks' favor, grant summary judgment

in the BCC's favor as to the eight executive sessions, and remand for trial on the June 7

executive session matter and the private quorum claim, not a part of this appeal.