[Cite as *Total Quality Logistics, L.L.C. v. JK & R Express, L.L.C.*, 2022-Ohio-3969.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, L.L.C., | : | CASE NO. CA2022-02-005 |
| Appellant, | : | O P I N I O N<br>11/7/2022 |
| | : | |
| - vs - | : | |
| | : | |
| JK & R EXPRESS, L.L.C., | : | |
| Appellee. | : | |


CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2016 CVH 01684


Bricker & Eckler LLP, and Jeffrey P. McSherry, for appellant.

Whitten Law Office, and Chad M. Sizemore, for appellee.


**M. POWELL, P.J.**

{¶ 1} Appellant, Total Quality Logistics, L.L.C. ("TQL"), appeals a decision of the Clermont County Court of Common Pleas granting judgment in favor of appellee, JK & R Express, L.L.C. ("JK & R"), on TQL's claim for indemnification.

{¶ 2} TQL is a freight broker. As such, TQL arranges for the transportation of its customers' freight and cargo from one location to another. A TQL customer contracts with TQL for the transportation of its cargo by a motor carrier and TQL contracts with the motor

carrier. JK & R is such a motor carrier. In January 2016, TQL and JK & R entered into a broker-carrier agreement for JK & R to provide transportation services to TQL's customers. As pertinent here, the parties' broker-carrier agreement includes the following provisions.

> 8. **CARGO LIABILITY AND CLAIMS**. * * * CARRIER is fully responsible and liable for the freight once in possession of it, and the trailer(s) is loaded, even partially, regardless of whether a bill of lading has been issued, signed, and/or delivered to CARRIER. CARRIER's responsibility/liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery.

> 10. **INDEMNIFICATION**. CARRIER agrees to defend, indemnify, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims) arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER shall not be required to indemnify any party (including BROKER) for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.

{¶ 3} In June 2016, Contél Fresh, a TQL customer, contracted with TQL for the transportation of a load of Awe Sum Organics apples from Washington State to Missouri and New Jersey for $6,500. TQL arranged for JK & R to transport the apples for $5,900. JK & R picked up the apples in Washington State and signed the bill of lading for the load. The bill of lading identified Awe Sum Organics as the shipper; Contél Fresh was not listed on the bill of lading. While en route to Missouri, JK & R's trailer caught fire; the apples were destroyed. TQL communicated with JK & R and Contél Fresh about the lost load.

{¶ 4} Contél Fresh submitted an invoice to TQL for $86,240 and included the invoice from its supplier substantiating that value. On July 11, 2016, and September 30, 2016, TQL notified JK & R of the claim with a Standard Form for Presentation of Loss and

Damage Claim. However, before JK & R could respond, TQL paid Contél Fresh for the loss of the apples by offsetting $86,240 from its open invoices with Contél Fresh. Contél Fresh then released TQL and assigned all claims and causes of action it had against JK & R to TQL.

{¶ 5} In addition to the amount it paid for the lost apples, TQL also lost the $6,500 freight-brokerage fee Contél Fresh had agreed to pay for the shipment. On December 7, 2016, TQL filed a complaint against JK & R, alleging breach of contract or, in the alternative, unjust enrichment and promissory estoppel. The complaint sought $83,666 in damages. TQL calculated the damages by combining the $86,240 it paid Contél Fresh for the lost apples (the cargo loss claim) with the $6,500 freight-brokerage fee Contél Fresh would have paid TQL had the apples been successfully delivered, and subtracting $9,074, the amount TQL owed JK & R on open invoices. JK & R answered the complaint, denying TQL's claims and seeking an award of attorney fees, costs, and expenses.

{¶ 6} On January 17, 2018, TQL and JK & R both moved for summary judgment. TQL argued it was entitled to the balance owed under the broker-carrier agreement because JK & R had breached the contract. JK & R argued that TQL was not contractually compelled to pay Contél Fresh, nor was it compelled to pay Contél Fresh by a judgment of a court. JK & R asserted that because TQL had no obligation to pay for the lost apples, TQL voluntarily settled the claim merely as a business consideration and thus failed to satisfy the second indemnification requirement under *Globe Indemn. Co. v. Schmitt*, 142 Ohio St. 595 (1944). JK & R asserted it was therefore not required to pay TQL for the loss of the cargo. TQL responded that *Globe* does not apply because there is an express indemnification provision in the parties' broker-carrier agreement governing loss of cargo.

{¶ 7} TQL submitted the affidavit of Marc Bostwick, TQL's corporate representative, with its motion for summary judgment. Bostwick averred that TQL reimbursed Contél Fresh

for the loss of the apples. Bostwick did not aver that TQL was required to pay Contél Fresh for the lost apples. In his deposition, Bostwick denied knowledge of an agreement between TQL and Contél Fresh for TQL to reimburse Contél Fresh for cargo loss. Bostwick testified that TQL's reimbursement was a business decision to maintain TQL's business relationship with Contél Fresh. JK & R's owner acknowledged in his deposition that JK & R, not TQL, was responsible for the lost apples and that the parties' broker-carrier agreement imposes such a liability upon JK & R.

{¶ 8} The trial court found that JK & R was entitled to judgment as a matter of law on TQL's cargo-loss claim. The trial court determined that for TQL to prevail on its cargo-loss claim, TQL must satisfy the three common-law requirements for indemnification outlined in *Globe*. In that case, the Ohio Supreme Court held that when an indemnitee settles a claim instead of litigating it, the indemnitee is entitled to indemnification if the indemnitee proves that (1) he provided proper and timely notice to the indemnitor, (2) the indemnitee was legally liable to respond, and (3) the settlement was fair and reasonable. *Globe*, 142 Ohio St. at 604. The trial court found that TQL failed to show it was legally liable for the loss of the apples, and thus, did not satisfy the second *Globe* requirement. Accordingly, TQL was not entitled to indemnification from JK & R under *Globe* after it had voluntarily settled the claim with Contél Fresh.

{¶ 9} TQL appealed the trial court's decision to this court. TQL argued that *Globe* and its progeny did not apply because of the express indemnification provision in the broker-carrier agreement. On January 7, 2019, we upheld the trial court's grant of summary judgment to JK & R. *Total Quality Logistics, L.L.C. v. JK & R Express, L.L.C.*, 12th Dist. Clermont No. CA2018-05-034, 2019-Ohio-20. We found that *Globe* applies to cases in which there is an indemnification provision in the contract between the parties. *Id.* at ¶ 16. Accordingly, in order to prevail on its contractual-indemnity claim, TQL was required to

satisfy its burden under *Globe*. *Id.* Upon finding that TQL had failed to show it was legally liable to respond to Contél Fresh's claim, we concluded that TQL had failed to establish the second requirement in *Globe* and was therefore not entitled to indemnification from JK & R. *Id.* at ¶ 19-21.

{¶ 10} The Ohio Supreme Court accepted TQL's discretionary appeal to consider whether the common-law requirements for indemnification set out in *Globe* (hereinafter the "*Globe* requirements") apply when the rights of the parties are governed by a contract that includes an indemnification provision. *Total Quality Logistics, L.L.C. v. JK & R Express, L.L.C.*, 164 Ohio St.3d 495, 2020-Ohio-6816, ¶ 1. The supreme court held that the *Globe* requirements "do not apply when the parties express a clear intent to abrogate those common-law requirements in their contract." *Id.* "If the language used in the parties' contract evinces a clear intent to abrogate the common-law *Globe* requirements, the contract should be applied as written and the indemnitor is obligated to indemnify the indemnitee under the terms of the agreement." *Id.* at ¶ 16. Noting that both this court and the trial court applied the *Globe* requirements without considering whether the parties intended to abrogate those requirements pursuant to the indemnification provision in the broker-carrier agreement, the supreme court reversed this court's opinion and remanded the matter to the trial court to make that determination. *Id.* at ¶ 19.

{¶ 11} On remand, the parties filed competing memoranda on whether the parties intended to abrogate the *Globe* requirements in their broker-carrier agreement. On June 21, 2021, the trial court granted judgment in favor of JK & R and against TQL on TQL's indemnification claim. The trial court found that the broker-carrier agreement did not express a clear intent to abrogate the *Globe* requirements because "[n]owhere in the [Agreement] does it state that TQL has any right, obligation, or option to voluntarily pay a customer's claim, without legal liability on the part of TQL, and then seek reimbursement or

indemnity from JK & R[.] Nor does the Agreement, in any manner, refer or allude to the common-law indemnity requirements set forth in *Globe*."

{¶ 12} The following day, JK & R filed a notice of its intent to seek an award of attorney fees against TQL. By agreement of the parties, the trial court determined JK & R's motion for attorney fees based upon the parties' memoranda and affidavits. On February 1, 2022, the trial court awarded JK & R $87,002.80 in attorney fees.

{¶ 13} TQL now appeals the trial court's June 21, 2021, and February 1, 2022 decisions, raising two assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT TO JK & R ON TQL'S BREACH OF CONTRACT CLAIM AS TO CARGO LOSS.

{¶ 16} TQL argues the trial court erred in granting summary judgment in favor of JK & R on TQL's indemnification claim, raising three issues for review.

{¶ 17} An appellate court reviews a trial court's decision on a motion for summary judgment de novo, independently and without deference to the decision of the trial court. *Flagstar Bank, FSB v. Sellers,* 12th Dist. Butler No. CA2009-11-287, 2010-Ohio-3951, ¶ 7. Summary judgment is proper when there is no genuine issue of material fact remaining for trial, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion adverse to the nonmoving party, construing the evidence most strongly in that party's favor. *See* Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64 (1978).

{¶ 18} On the same day the Ohio Supreme Court issued its decision in *JK & R*, the court issued *Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 164 Ohio St.3d 480, 2020-Ohio-6821. Both decisions considered whether the *Globe* requirements apply when the parties' contract includes an indemnification provision. In *JK & R*, the supreme court

was concerned with the second *Globe* requirement—whether TQL was legally liable to pay the loss. In *Wildcat Drilling*, the supreme court was concerned with the first *Globe* requirement—whether Discovery Oil was required to notify Wildcat of its intention to pay the loss. In both cases, the supreme court held that "the requirements set out in *Globe* for determining whether an indemnitee may recover against an indemnitor when the indemnitee has settled a claim without the indemnitor's involvement, do not apply when the parties express a clear intent to abrogate those common-law requirements in their contract." *JK & R*, 2020-Ohio-6816 at ¶ 14; *Wildcat Drilling* at ¶ 1. In both cases, the supreme court reversed and remanded the matter for the trial courts to determine whether the parties' contracts expressed a clear intent to abrogate the *Globe* requirements.

{¶ 19} In so holding, the supreme court observed, "In Ohio, parties have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *JK & R* at ¶ 16. "That includes the right to include contractual terms that abrogate the common law." *Id.* However, "the intent to do so must be clearly indicated. That intent must be reflected in the language the parties used in their contract. This principle applies to indemnification agreements." *Id.* Consequently, "[i]f the language used in the parties' contract evinces a clear intent to abrogate the common-law *Globe* requirements, the contract should be applied as written and the indemnitor is obligated to indemnify the indemnitee under the terms of the agreement." *Id.* In *Wildcat Drilling*, the supreme court further recognized that "the 'nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used' in the agreement." *Wildcat Drilling* at ¶ 14, quoting *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240 (1987).

{¶ 20} The supreme court recognized that the parties' broker-carrier agreement "does not expressly abrogate the *Globe* requirements. [However], no talismanic or magical

language is required in order for parties to abrogate the common law through contractual terms. We must look to the language that the parties used in their contract to determine their intent regarding an indemnification provision." *JK & R*, 2020-Ohio-6816 at ¶ 17. In light of the lead opinion's conclusion that a contract's failure to expressly abrogate *Globe* is not automatically outcome determinative and its declining to adopt Justice Donnelly's dissenting analysis below, the lead opinion's language above suggests that a clear intent to abrogate the *Globe* requirements may be implicitly expressed in the contract.

{¶ 21} Both supreme court decisions were plurality opinions. Justices French, O'Connor, and Stewart joined in the lead opinion, holding that the *Globe* requirements apply unless the parties' contract expresses a clear intent to abrogate those requirements. Justice Kennedy concurred in judgment only, concluding that *Globe* was an inapplicable tort opinion, its requirements were dicta, and the matter should be remanded to be decided based solely on the parties' contract. Justices Fisher and DeWine concurred in judgment only, stating that an express indemnification provision in a contract clearly indicates that the parties want to be governed by the indemnification provision, and not by *Globe*. These justices would have remanded the case for the trial court to resolve the matter based solely on the contract. Justice Donnelly dissented, stating that *Globe* always applies, regardless of whether there is an indemnification provision in a contract: "If the parties to a contract intend to override [the *Globe*'s requirements], they should do so expressly, not impliedly by merely including an indemnification clause." *Wildcat Drilling*, 2020-Ohio-6821 at ¶ 44. Thus, the lead opinion's three justices held that the *Globe* requirements may or may not apply depending upon the contract between the indemnitee and the indemnitor; one justice held that the *Globe* requirements always apply absent express abrogation; and three justices held that the *Globe* requirements never apply in cases involving a contractual indemnification provision.

{¶ 22} **Whether the Plain Language of the Broker-Carrier Agreement Demonstrates the Parties' Intent to Abrogate the Common-Law Indemnification Requirements of *Globe***

{¶ 23} In its first issue for review, TQL argues the trial court erred in holding that the parties' broker-carrier agreement does not abrogate the *Globe* requirements. TQL asserts that the agreement is "replete with language that demonstrates [the parties'] intent to abrogate the common law indemnity requirements," specifically Sections 8, 8(e), and 10. TQL also cites *Total Quality Logistics, L.L.C. v. New Vision Transp., Inc.*, Clermont C.P. No. 2016 CVH 00926 (Nov. 13, 2017), and *Total Quality Logistics, L.L.C. v. Dadir, L.L.C.*, Clermont C.P. No. 2016 CVH 00705 (May 21, 2019), in support of its argument that Section 10 is unambiguous and enforceable.

{¶ 24} We first address the applicability of *Dadir* and *New Vision*. Both cases involved similar cargo claims by TQL against its contracted carriers. In both cases, TQL paid its customer for the cargo loss and sought indemnification from its carrier under the same indemnification provision as here. In *Dadir*, the common pleas court found that Section 10 clearly and unambiguously provided that the carrier, Dadir, agreed to indemnify TQL for cargo loss. In *New Vision*, the common pleas court found that the claim TQL paid to settle with its customer was a claim within the meaning of Section 10, and that "the express terms" of Section 10 were an unconditional requirement for the carrier, New Vision, to indemnify TQL for cargo loss. However, the *Globe* requirements were not implicated in either case. As the issue of whether the broker-carrier agreement abrogates the *Globe* requirements was neither raised nor addressed in *Dadir* and *New Vision*, these cases are not applicable precedent here.

{¶ 25} We now turn to TQL's argument that Sections 8, 8(e), and 10 of the parties' broker-carrier agreement evinces a clear intent to abrogate the *Globe* requirements. The

pivotal question is whether the parties clearly intended to require JK & R to indemnify TQL for voluntary settlements by TQL of a customer's claim under Sections 8, 8(e), and 10 of the broker-carrier agreement.

{¶ 26} Legal issues involving contract interpretation are subject to a de novo standard of review. *Merritt v. Anderson*, 12th Dist. Fayette No. CA2008-04-010, 2009-Ohio-1730, ¶ 18. With the issue of contract interpretation, the intent of the parties is paramount. *Deerfield Twp. v. Mason*, 12th Dist. Warren No. CA2011-12-138, 2013-Ohio-779, ¶ 16. A court is to examine the contract as a whole and presume that the intent of the parties is reflected within the contract language itself. *Id.* In determining the parties' intent, courts must consider the meaning of the contract language "with reference to the object to be accomplished by the contracting parties." *McBride v. Prudential Ins. Co. of America*, 147 Ohio St. 461, 463 (1947).

{¶ 27} Pursuant to well-established principles of transportation law, cargo damage claims against interstate motor carriers are determined under the Carmack Amendment to the ICCTA (Interstate Commerce Commission Termination Act) whereas the amendment does not specifically govern brokers in the scheme of interstate cargo loss and damage liability. *Total Quality Logistics, L.L.C. v. Red Chamber Co.*, 12th Dist. Clermont No. CA2016-09-062, 2017-Ohio-4369, ¶ 11.

{¶ 28} Consistent with the Carmack Amendment, Section 8 of the broker-carrier agreement places the risk of cargo loss solely upon JK & R as the carrier. Pursuant to the Carmack Amendment, TQL was not liable to Contél Fresh for the cargo loss. The record does not include the contract between TQL and Contél Fresh to permit a determination of whether TQL was contractually liable to Contél Fresh for the cargo loss. However, Bostwick's affidavit and deposition suggest that TQL was not legally liable to Contél Fresh and instead voluntarily paid Contél Fresh for the loss to maintain their business relationship.

{¶ 29} Section 10 of the broker-carrier agreement, the indemnification provision, provides in pertinent part that JK & R agrees to indemnify TQL and its customers for "any and all claims or liability arising out of or in any way related to JK & R's performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage." Thus, Section 10 explicitly provides that TQL is entitled to be indemnified by JK & R for any and all claims or liability for cargo loss. Contél Fresh invoiced TQL for the loss of its apples. Thus, ignoring whether TQL was legally liable for the loss, TQL was subject to a "claim" for cargo loss which arose out of JK & R's failure to perform under the broker-carrier agreement (failure to deliver the apples).

{¶ 30} Section 8(d) provides that

> Except as provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers and by the Carmack Amendment codified in 49 U.S.C. § 14706. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including electronic or facsimile transmission.

{¶ 31} Section 8(e) provides that

> Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement. Notwithstanding any other provision in this Agreement, BROKER reserves the right to offset any claim(s) with CARRIER's pending invoices.

{¶ 32} Consistent with the Carmack Amendment, Sections 8(d) and 8(e) make JK & R, as carrier, exclusively liable for cargo loss. Section 8(e) defines how JK & R is to respond to a notice of a cargo loss claim. JK & R acknowledges that Section 8(e) allows TQL to offset cargo loss claims with JK & R's open invoices with TQL but argues it does not

authorize TQL to use its own funds to pay its customer for cargo loss claims. However, Section 8(e) relates to the carrier's liability for cargo loss and does not address the party to whom it may be ultimately responsible. The language of Section 8(e) allowing TQL to offset cargo loss claims with JK & R's open invoices with TQL indicates that JK & R is liable to TQL for cargo loss.

{¶ 33} The parties' broker-carrier agreement is designed to make TQL the single point of contact for its customers and contracted carriers, thereby preventing interaction and communication between the customers and contracted carriers. Section 4(b) illustrates such theme by providing that "CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstance, will CARRIER contact and/or seek payment from any shipper, consignee, CUSTOMER, or any other party responsible for any payment related to the Services."

{¶ 34} Section 10, which plainly and unconditionally entitles TQL to indemnification from JK & R for cargo loss claims, is part of that scheme. Section 10 plainly contemplates that TQL may pay the customer for cargo claims, as otherwise there would be nothing for the carrier to indemnify. The provision for indemnifying TQL for a cargo claim is consistent with TQL making a voluntary payment to its customer. In other words, TQL's voluntary payment to a customer qualifies as a "claim" under Section 10 because the broad "any and all claims" phrase of Section 10 is not limited or modified by an introductory clause and there is no language excluding voluntary payments or settlements by TQL. Moreover, JK & R is not prejudiced by TQL making voluntary payment of cargo claims to its customers, as JK & R's liability for the loss is unaffected. It is only a matter of whom JK & R pays for the loss.

{¶ 35} Inclusion of an unqualified duty of JK & R to indemnify TQL for cargo loss alone expresses a clear intent to abrogate *Globe* for two reasons. First, the Carmack

- 12 -

Amendment places lability for cargo loss exclusively upon the carrier listed on the bill of lading. Thus, TQL, as broker, has no liability for cargo loss and would have nothing to be indemnified for in the event of cargo loss under *Globe*. Inclusion of a provision for indemnification of TQL clearly expresses an intent that TQL has a right to be indemnified for payments it makes without legal obligation to do so. Second, if Section 10 of the broker-carrier agreement did not include the indemnification provision in TQL's favor, TQL would still have the right under *Globe* to seek indemnification from JK & R for payments for which it was otherwise legally liable. Thus, inclusion of the indemnification provision would be redundant unless it was intended to provide rights beyond those recognized by *Globe*.

{¶ 36} Notwithstanding the foregoing, we need not rely solely upon inclusion of the indemnification provision in TQL's favor to find an expressed clear intent to abrogate *Globe*. The duty of JK & R to indemnify TQL for cargo claims set forth in Section 10 of the broker-carrier agreement must also be read in the context of the entire agreement. The parties' broker-carrier agreement provides that: (1) the carrier is fully responsible and liable for the cargo once in possession of it and until it is properly and timely delivered; (2) the carrier looks only to TQL for payment and agrees to neither contact nor seek payment from TQL's customers; (3) the contact between the carrier and shipper is limited to "the minimum level of contact necessary to perform the services"; (4) in the event a claim arises, the carrier agrees to accept notice of the claim from TQL, as opposed to a shipper or customer, and agrees TQL has the right to offset any claim with JK & R's open invoices with TQL without any exception; (5) the carrier agrees to indemnify TQL and its customers for any and all claims for cargo loss and damage arising out of or relating to the carrier's performance or failure to perform; and (6) the only limitation on indemnification is when a claim or liability arises directly and solely from the negligence or willful misconduct of TQL or another party, not the carrier, which limitation is inapplicable here. The broker-carrier agreement,

considered as a whole, is intended to make TQL the single point of contact for its contracted carriers and responsible for the complete administration of the shipment, including resolving cargo claims without involvement of the shipper or customer.

**{¶ 37}** For the reasons expressed above, we find the trial court erred in finding that the parties' broker-carrier agreement does not evince a clear intent to abrogate the *Globe* requirements. TQL's first issue for review is well taken.

**{¶ 38}** **Whether the Trial Court Erred by Requiring Express Statements of Abrogation or Specific Language Relating to the *Globe*'s Second Requirement for There to Be a Clear Contractual Intent to Abrogate the *Globe*'s Indemnification Requirements**

**{¶ 39}** In its second issue for review, TQL argues the trial court erred in finding that the broker-carrier agreement does not evince a clear intent to abrogate the *Globe* requirements because the agreement lacks language explicitly abrogating the *Globe* requirements or permitting TQL to voluntarily pay its customer's claim without legal liability and then seek indemnification from JK & R. In support of its argument, TQL cites *Glaspell v. Ohio Edison Co.*, 29 Ohio St.3d 44 (1987), and *Worth v. Huntington Bancshares, Inc.*, 43 Ohio St.3d 192 (1989).

**{¶ 40}** *Glaspell* involved a license agreement pursuant to which a cable television company was granted a license to install its equipment upon a telephone company's utility poles. The agreement contained an indemnification provision that required the cable company to indemnify the telephone company for any loss it may suffer by reason of the installation, maintenance, or use of the cable company's equipment on the poles. A cable company employee sued the telephone company for injuries he sustained when he fell from an alleged negligently maintained pole. The telephone company impleaded the cable company into the litigation, claiming that the indemnification provision required the cable

company to indemnify the telephone company for damages resulting from the cable company's installation and maintenance of its equipment on the utility poles. The trial court and the court of appeals found that the telephone company was not entitled to indemnification because the license agreement "failed to express in clear and unequivocal terms" that the cable company was required to indemnify the telephone company for the latter's own negligence.

{¶ 41} The Ohio Supreme Court reversed, holding that the cable company was liable to indemnify the telephone company even though the agreement did not specifically state the telephone company could be indemnified for loss caused by its own negligence: "[T]he word 'negligence' need not be utilized where an intention to exclude liability predicated upon such is set forth by words excluding liability 'for any and all harms however caused.'" *Glaspell*, 29 Ohio St.3d at 47-48. "What was intended by the parties, as evidenced by the words utilized in the agreement at issue, was that in exchange for rights of access to [the telephone company's] facilities, the cable company was obligated to bear all risk of additional harm which might occur in connection with [the cable company's] right of access." *Id.* at 48. "Since the subject of liability was anticipated in the indemnity agreement, such indemnification must be provided to [the telephone company]." *Id.* Thus, the supreme court found that the public policy-based rule that an indemnitee may not recover for its own negligence was abrogated by the parties' contractual broad language providing for indemnification "for any loss" occasioned by the cable company's installation or maintenance of its equipment on the telephone company's property.

{¶ 42} *Worth* involved a bank executive's "golden parachute" agreement which provided certain benefits should he separate employment from the company after a hostile takeover. In particular, the agreement provided that the executive was entitled to employ legal counsel at the company's expense "in connection with the initiation or defense of any

litigation" relating to the "golden parachute" benefits. When the executive separated from employment and the acquiring company refused to pay the "golden parachute" benefits, the executive sued. The trial court found that the executive was not entitled to the benefits and thus to reimbursement of his legal fees because he had not prevailed in the litigation.

{¶ 43} The supreme court reversed on the executive's claim for indemnification of attorney fees, holding that

> The provision's clear intent is to guarantee full indemnification of Worth's legal expenses incurred in enforcing or defending the agreement regardless of his ultimate success. While Worth was not successful in this endeavor, his legal expenses were indisputably incurred in an attempt to enforce the agreement. Nothing in Section 5 suggests that successful enforcement or defense is a prerequisite to recovery of attorney fees, and we decline to read such a condition into the contract absent a showing that Worth acted in bad faith or that he prosecuted this action with no colorable claim of success.

*Worth*, 43 Ohio St.3d at 199. Thus, the supreme court found that the executive was entitled to be indemnified for his litigation expenses because the contract did not condition indemnity upon the indemnitee's success in the litigation.

{¶ 44} The supreme court cited *Glaspell* and *Worth* in *JK & R* as instances where "talismanic or magical language" was unnecessary for parties to abrogate common-law indemnity. *JK & R*, 2020-Ohio-6816 at ¶ 17-18 (finding that the indemnitee in *Worth* was entitled to recover his attorney fees because the indemnification provision in the contract did not condition the recovery of such fees on the indemnitee's success; and finding that the contractual language in *Glaspell* reflected a clear intent by the parties to permit indemnification for the indemnitee's own negligence, and that the contract was not required to expressly refer to the indemnitee's own negligence).

{¶ 45} JK & R correctly points out that following the supreme court's remand in *Wildcat Drilling*, the Seventh District Court of Appeals rejected *Worth* and *Glaspell* as

guiding precedent in its opinion because neither implicated a *Globe* requirement. *Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 7th Dist. Mahoning No. 21 MA 0070, 2022-Ohio-1125, ¶ 33-35. Nonetheless, as stated above, the supreme court cited *Worth* and *Glaspell* in *JK & R* as examples of how contractual abrogation of common-law indemnity requirements may be accomplished without "talismanic or magical language." *JK & R* at ¶ 17-18. Rather, "[w]e must look to the language that the parties used in their contract to determine their intent regarding an indemnification provision." *Id.* at ¶ 17. Despite there being no *Globe* issues in *Worth* or *Glaspell*, each serves as an example of the kind of contractual language that may be considered in determining if the parties to the contract intended to abrogate common-law indemnity.

{¶ 46} Much like the golden parachute agreement in *Worth* and the indemnity clause in *Glaspell*, the broker-carrier agreement provides unequivocally that JK & R, as carrier, is to indemnify TQL for cargo loss. The agreement does not except JK & R's duty to indemnify TQL in instances where TQL voluntarily pays its customer for cargo loss. Just as the supreme court declined to read into the *Worth* golden parachute agreement a condition that recovery of attorney fees was dependent upon prevailing in the litigation, and similarly refused to read into the *Glaspell* indemnity clause a condition that indemnity did not apply in cases of the indemnitee's own negligence, we decline to read into the parties' broker-carrier agreement a condition that JK & R's duty to indemnify TQL for cargo loss is excepted if TQL makes a voluntary payment.

{¶ 47} Furthermore, although the parties' broker-carrier agreement does not expressly abrogate the *Globe* requirements or specifically refer to *Globe*, the Ohio Supreme Court plainly found that such was not required and was not outcome determinative of the issue at bar. The trial court, therefore, erred in finding that the broker-carrier agreement does not evince a clear intent to abrogate the *Globe* requirements because the agreement

does not expressly abrogate the *Globe* requirements, the agreement does not specifically refer to *Globe*, and its language does not specifically waive the second *Globe* requirement. TQL's second issue for review is well taken.

**{¶ 48} <u>Whether the Trial Court Erred by Construing the Broker-Carrier Agreement against TQL as the Drafter</u>**

**{¶ 49}** In its third issue for review, TQL challenges the trial court's determination that any ambiguity in the parties' broker-carrier agreement must be strictly construed against TQL as the drafter of the agreement.

**{¶ 50}** In its June 21, 2021 decision, the trial court noted that TQL was the drafter of the broker-carrier agreement, stated that "any ambiguity in the Agreement must be strictly construed against TQL as the drafter," and cited our opinion in *Drone Consultants, L.L.C. v. Armstrong*, 12th Dist. Warren No. CA2015-11-107, 2016-Ohio-3222, where we stated, "'[W]here there is doubt or ambiguity in the language of a contract it will be construed strictly against the party who prepared it. * * * In other words, he who speaks must speak plainly or the other party may explain to his own advantage.'" *Id.* at ¶ 15, quoting *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 80 (1967).

**{¶ 51}** Notwithstanding the trial court's foregoing statement and its citation to our *Drone* opinion, the trial court did not find that the provisions of the broker-carrier agreement were susceptible to two or more reasonable interpretations, did not identify the ambiguity in the agreement that it construed against TQL, and instead found that the parties' broker-carrier agreement did not express a clear intent to abrogate the *Globe* requirements. While the trial court noted that the agreement neither explicitly abrogates the *Globe* requirements nor permits TQL to voluntarily pay its customer's claim without legal liability and then seek reimbursement from JK & R, the absence of such language in the agreement does not render the agreement ambiguous. As the trial court never incorporated the legal principles

regarding ambiguous contracts in its analysis and ultimate decision, its statement above and citation to *Drone* were merely surplusage without legal significance. We find no merit to TQL's third issue for review.

{¶ 52} In light of the foregoing, we find that the trial court erred in finding that the parties' broker-carrier agreement does not evince a clear intent to abrogate the *Globe* requirements. Accordingly, we reverse the trial court's decision granting summary judgment in favor of JK & R and against TQL on TQL's indemnification claim and remand the case to the trial court for further proceedings. TQL's first assignment of error is sustained.

{¶ 53} Assignment of Error No. 2:

{¶ 54} THE TRIAL COURT ERRED BY AWARDING ATTORNEY FEES AND EXPENSES TO JK & R AS THE PREVAILING PARTY DESPITE FAILING TO TIMELY SEEK ATTORNEY FEES, NOT SUFFERING A LOSS, AND NOT PREVAILING.

{¶ 55} TQL argues that the trial court erred in awarding JK & R attorney fees because (1) JK & R waived its claim for attorney fees or was otherwise barred by res judicata, (2) JK & R incurred no attorney fees and costs in defending itself as all of its defense costs were paid by its insurer, (3) the trial court improperly relied on *State ex rel. Stricker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, and *Bell v. Nichols*, 10th Dist. Franklin No. 10AP-1036, 2013-Ohio-2559, two cases involving R.C. 2323.51, Ohio's frivolous conduct statute, and the policy behind it, which are not at issue here, and (4) TQL, not JK & R, is the prevailing party as it prevailed on its breach-of-contract claim (JK & R's failure to deliver the apples) and was awarded $600 by the trial court.[1]

{¶ 56} In light of our resolution of TQL's first assignment of error, TQL's second

---

1. In its original decision granting judgment in favor of JK & R on TQL's cargo-loss claim, the trial court granted summary judgment to TQL on its freight-brokerage-fee claim, determining that JK & R was fully liable for the losses associated with the freight once the freight had been in its possession under the terms of the broker-carrier agreement. The trial court determined that TQL was entitled to $600 on its freight-brokerage-fee claim.

assignment of error is moot and need not be addressed. *See* App.R. 12(A)(1)(c); *Poteet v. MacMillan*, 12th Dist. Warren No. CA2021-08-071, 2022-Ohio-876.

{¶ 57} Judgment reversed and remanded.

HENDRICKSON and BYRNE, JJ., concur.