[Cite as *Roesel v. DQ Dream Properties, L.L.C.*, 2026-Ohio-608.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| KENNETH ROESEL, | : | CASE NO. CA2024-10-121 |
| Appellant and Cross-Appellee, | : | |
| vs. | : | OPINION AND JUDGMENT ENTRY 2/23/2025 |
| DQ DREAM PROPERTIES, LLC, et al., | : | |
| Appellees and Cross-Appellants. | : | |
| | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV 2021 05 0614

Stephen C. Lane, for appellant and cross-appellee.

David B. Brewer and Fred Miller, for appellee and cross-appellant, DQ Dream Properties, LLC.

Nicholas J. Ziepfel, for appellee and cross-appellant, Lakota Tomahawks Youth Football Assoc., Inc.

Stephen S. Schmidt, for appellee, Tanya Roesel.

**O P I N I O N**

**SIEBERT, J.**

{¶ 1}   This case is a five-year epic involving a property sale, a lease breached as a result of that property sale, and what turned out to be a $150,000 equipment shed. The people and entities involved include Kenneth Roesel, Kenneth's ex-wife, Tanya Roesel, their company Roesel Enterprises, DQ Dream Properties, LLC, DQ's co-owners—Qiao "Winnie" and Derick Hunt, and the Lakota Tomahawks Youth Football Association, Inc.[1]

{¶ 2}   Upon review of the parties' various assignments of error, we agree the Tomahawks possessed a valid lease on the property DQ purchased from Roesel Enterprises. However, we conclude that genuine material issues of fact precluded summary judgment on DQ's fraud claims against Kenneth and in favor of Tanya. We find no issue with the jury's valuation of the damages sustained by the Tomahawks arising from the breach of its lease. Finally, we conclude the trial court abused its discretion by summarily excluding all "block-billed" fees from the Tomahawks attorney fees award and by reducing the fee award by a blanket percentage prior to summary judgment. Following summary judgment, we conclude the Tomahawks are only entitled to the fees directly related to the portion of the trial related to the jury's determination the Tomahawks should be awarded attorney fees.

{¶ 3}   We affirm the trial court in part, reverse the trial court in part, and remand to the trial court for further proceedings consistent with this opinion.

**What Happened—The Basics**

{¶ 4}   This action stems from the June 2020 sale of commercial real property in Butler County (the "Property") from Roesel Enterprises, LLC to DQ. Kenneth and Tanya were the two sole members of Roesel Enterprises.[2] Approximately five years prior to the

---

1. Kenneth, DQ, and the Tomahawks all raise issues on appeal. Tanya raises no issues on appeal but is a cross-appellee to issues raised by DQ.

2. DQ never named Roesel Enterprises as a defendant in this action, choosing to pursue their claims against Kenneth and Tanya individually.

- 2 -

sale of the Property, Tanya, acting as manager for Roesel Enterprises, signed a lease agreement with KER Entertainment Inc., a company owned by Kenneth (the "KER Lease"). By its stated terms, the KER Lease expired on May 31, 2020, with three options to renew for five years each. Neither Roesel Enterprises nor KER Entertainment renewed the KER Lease before the initial term expired.

{¶ 5} On February 15, 2017, Roesel Enterprises executed a 20-year lease for a portion of the Property with the Tomahawks for $250 per year (the "Tomahawks Lease"). Kenneth is a longtime supporter of the Tomahawks and signed this lease on behalf of Roesel Enterprises. Consistent with the Tomahawks Lease, the Tomahawks then built a 960 square foot shed on their leased portion of the Property to store its football equipment. The Tomahawks Lease stated it, "shall run with the land." Neither Roesel Enterprises nor the Tomahawks recorded the Tomahawks Lease with the county recorder's office.

{¶ 6} Kenneth and Tanya later divorced, and they decided to sell the Property. Roesel Enterprises listed the Property for sale late in 2019. DQ[3] made an offer to purchase the Property on December 6, 2019 (the "2019 Offer"), which later fell through. Winnie signed the 2019 Offer, which included the following language:

> POSSESSION: Possession shall be given, subject to tenants' rights, upon Closing. Tenants' rights in the [Property] are: *Upon acceptance of this contract current owner shall provide notice of lease termination to existing tenant and tenant shall vacate the premises within 60 days of closing unless otherwise agreed in writing by tenant and DQ . . . Buyer will be granted occupancy of vacant portion of building at closing.*

(Emphasis added.) The language italicized above was added to the 2019 Offer's boilerplate language.

{¶ 7} Months later on April 23, 2020, DQ and Roesel Enterprises entered into a

---

3. DQ Dream Homes, LLC, a related company to DQ Dream Properties, LLC, made the offer. Winnie and Derick Hunt are principals of both companies, no party raised any distinction between them, and any distinction between the entities is irrelevant to our analysis.

"Purchase Agreement" for the purchase and sale of the Property which read, in relevant part, "[p]ossession shall be given, subject to tenants' rights, upon Closing. Tenants' rights in the Real Estate are: *No tenant rights apply*. Property to be vacant and empty at closing. Buyer to take occupancy immediately following closing."[4] (Emphasis added.) Winnie and Kenneth signed the Purchase Agreement.

{¶ 8}   DQ conducted an inspection of the Property before closing which identified the Tomahawks' use of the shed. Derick testified via deposition that DQ's "response to that" information was to have an addendum written which stated, "that when [DQ] take[s] possession, everybody is to be out." Indeed, DQ prepared an "Addendum" to the Purchase Agreement, which stated, "[the Tomahawks], who [are] currently utilizing a detached garage in the rear of the Property, will be vacated after closing at Buyer's discretion." Only Tanya signed the Addendum on May 30, 2020, and Kenneth claimed he was unaware of it. Various other discussions purportedly occurred between DQ, the Roesels, and the Tomahawks regarding use of the shed. Those will be discussed in further detail later in this opinion.

{¶ 9}   DQ and Roesel Enterprises closed on the Property's sale on June 5, 2020. After closing, the Tomahawks did not vacate the Property, and DQ took no immediate steps to evict them. Derick stated in his deposition that at closing, DQ was "still making a decision [of whether] to let [the Tomahawks] stay for the season" because DQ had not moved into the building, "and [the Tomahawks] weren't hurting anything at that moment." However, when the Tomahawks sent a check to DQ in April of 2021 for that year's rent— almost one year after the sale of the Property—DQ rejected the payment, built a locked fence around the shed, prevented the Tomahawks from entering the Property, and filed

---

4. This language was also added to the Purchase Agreement's boilerplate language.

- 4 -

the instant lawsuit.

{¶ 10} DQ's amended complaint stated claims for declaratory judgment, quiet title, and slander of title against the Tomahawks, asserting the Tomahawks Lease was "null and void" and otherwise unenforceable. DQ also asserted an unjust enrichment claim against the Tomahawks, claiming that if valid, the Tomahawks Lease's below market rent resulted in a massive windfall for the Tomahawks. Finally, DQ alleged Kenneth and Tanya individually committed fraud for their purportedly false representations in the Purchase Agreement and the Addendum. The Tomahawks filed counterclaims against DQ for breach of contract, breach of covenant of quiet enjoyment, and promissory estoppel as an alternative claim to breach of contract.

{¶ 11} After the parties filed various motions for summary judgment, the trial court made several rulings relevant to this appeal: (1) the Tomahawks Lease was valid, and DQ was liable for breaching it;[5] (2) Kenneth committed fraud against DQ by not disclosing the existence of the Tomahawks Lease; and (3) Tanya did not commit fraud against DQ. As a result of these rulings, the trial court dismissed all of DQ's claims against the Tomahawks except its unjust enrichment claim. The trial court reserved the issue of the parties' damages for trial, and a jury awarded the Tomahawks $150,000 against DQ for its breach of the Tomahawks Lease. The jury also awarded the Tomahawks attorney fees against DQ, which the trial court later determined totaled $7,901.50. The jury awarded DQ $0 for its unjust enrichment against the Tomahawks but awarded DQ $150,000 in damages against Kenneth for fraud.

{¶ 12} We will discuss trial court rulings and other relevant matters within the parties' assignments of error in more detail below. We will also address the parties'

---

5. We note that DQ did not appeal the conclusion it would be liable to the Tomahawks for its breach if we affirmed the validity of the Tomahawks Lease.

assignments of error out of order and group them together where necessary to streamline the legal issues presented on appeal.

## Legal Issue #1 – Validity of the Tomahawks Lease

*DQ's First Assignment of Error – The Trial Court Erred in Finding the Lease Valid*

Relevant Facts and Ruling by the Trial Court

{¶ 13} The Tomahawks moved for summary judgment on DQ's claims challenging the validity of the Tomahawks Lease. Among other arguments, DQ asserted the Tomahawks Lease was invalid and unenforceable because Roesel Enterprises could not lease the same property to the Tomahawks after previously leasing it to KER Entertainment. But the trial court granted the Tomahawks' motion for summary judgment and found the Tomahawks Lease valid because Kenneth "was a principal" for and controlled both Roesel Enterprises and KER Entertainment. Moreover, the trial court concluded the Tomahawks "believed it was contracting the holder of title" for the Property and therefore "could rightly presume the contract valid."

Trial and Appellate Summary Judgment Standards

{¶ 14} "An appellate court reviews a trial court's decision on a motion for summary judgment de novo, independently and without deference to the decision of the trial court." *Total Quality Logistics, L.L.C. v. JK & R Express, L.L.C.*, 2022-Ohio-3969, ¶ 17 (12th Dist.).

{¶ 15} A trial court may grant summary judgment when, "there is no genuine issue of material fact remaining for trial, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion adverse to the nonmoving party, construing the evidence most strongly in that party's favor." *Id. See also* Civ.R. 56. Trial courts should "award summary judgment with caution," by resolving doubts and construing evidence in favor of the nonmoving party. *Welco Indus., Inc. v. Applied Cos.*,

67 Ohio St.3d 344, 346 (1993), citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356 (1992).

{¶ 16} The unsupported assertion by the moving party that the nonmoving party has no evidence to prove its case is not sufficient ground for the trial court to grant summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 1996-Ohio-107 (1996). However, if the moving party fulfills its burden and the nonmoving party presents no evidence to support the merits of their case, summary judgment is proper. *Welco Indus.* at 346, citing *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d. 108, paragraph three of the syllabus (1991). "Mere speculation is insufficient to create a genuine issue of material fact to avoid summary judgment." *Fontain v. H&R Cincy Properties*, LLC, 2022-Ohio-1000, ¶ 67 (12th Dist.).

{¶ 17} "But determining whether issues of disputed fact exist is different from making findings of facts. " *Smathers v. Glass*, 2022-Ohio-4595, ¶ 32. Generally, the trial court is in the "best position to determine the weight of the evidence and the credibility of witnesses when acting as a trier of fact." But at summary judgment, the trial court should just *review* the evidence, not *weigh* it. *Id*. And, again, any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.

## Analysis

{¶ 18} DQ argues the trial court erred in finding the Tomahawks Lease valid because Roesel Enterprises had no legal authority to enter into the Tomahawks Lease after entering into the KER Lease. DQ characterizes these leases as being "contradictory" and contends they "hopelessly muddled the legal status" of the Property. DQ further insists that because of this, questions remained regarding "what [the Tomahawks] knew and what they should have done" before entering into its own lease on the Property. Ultimately, DQ argues the Tomahawks Lease should be deemed void and unenforceable

from the beginning.[6]

{¶ 19} We find DQ's arguments unconvincing for two reasons. The first is that no conflict ever arose between these two purportedly contradictory leases by the time DQ purchased the Property. It is undisputed that Roesel Enterprises held the legal title to the Property when leasing parts of it to KER Entertainment and the Tomahawks. It is also undisputed that the KER Lease ended four days before DQ closed on the Property. During the time both leases existed, no legal conflict between Roesel Enterprises, KER Entertainment, and the Tomahawks ever arose. The harmonious sharing of the leased property essentially validated the lease. *See generally Alford v. Arbors at Gallipolis*, 2018-Ohio-4653, (4th Dist.) (finding ratification of contract may occur when "the person performing the act, even though not an agent, must at that time purported to have acted as an agent for the party subsequently adopting the act as its own.").

{¶ 20} DQ asserts that "[i]t was not until the Roesels sold the property and misrepresented the lack of a lease that the 'harmonious sharing' [between KER Entertainment and the Tomahawks] was disrupted." But the KER Lease, by its own terms, lapsed before the sale of the Property to DQ and eliminated any alleged need for KER Entertainment to continue to harmoniously share the Property with the Tomahawks. On the date DQ closed on the Property, the only lease that existed was the Tomahawks Lease, and Roesel Enterprises was unquestionably the rightful, original lessor. Ultimately, the only conflict that the Roesels' purported misrepresentations created in this case was not between two leaseholders (KER Entertainment and the Tomahawks), but between DQ (the new lessor by virtue of its purchase of the Property) and the Tomahawks (the

---

6. The parties and other courts sometimes use the legal term of art "void ab initio," which is a Latin phrase that literally means "void from the beginning." This court finds it important that everyone reading its opinions can understand them, so it generally avoids the use of Latin phrases, especially when they impact a substantive or critical question before the court.

only lessee remaining on the Property). This conflict did not manifest itself until the Tomahawks sought to pay their rent nearly a year after closing.

{¶ 21} The second reason we conclude the Tomahawks Lease is valid is that DQ offers no authority demonstrating the Tomahawks Lease should be deemed void from the beginning as opposed to merely voidable (or even reformable). *See generally Haven House Manor, Ltd. v. Gabel*, 2002-Ohio-6750, ¶ 15 (6th Dist.) (finding "the mere fact that a mistake was made in an instrument does not bar the right of reformation of a contract"); *Crout v. D.E.R. Bldg. Co.*, 2001 WL 1402734, *4 (12th Dist. Nov. 13, 2001) (holding "[a] trial court may reform a contract where there is proof that the parties made a mutual mistake of fact and both parties understood the contract as the complaint alleges it ought to have been"). In law, the distinction between void and voidable is often dispositive because if a court deems a contract or agreement void, it "is of no legal effect, so that there is really no contract in existence at all." CONTRACT, Black's Law Dictionary (12th ed. 2024). But if a contract is merely "voidable," it still has legal effect and can be enforceable, depending on other factors and findings relevant to the circumstances. *See id*.

{¶ 22} Therefore, even if Roesel Enterprises did not have the legal authority to enter into the Tomahawks Lease because of the KER Lease (*and* the KER Lease still existed when DQ took ownership of the Property), the legal remedy would not be to deem the Tomahawks Lease void or nonexistent—it would be to reform the Tomahawks Lease to be consistent with the KER Lease (assuming a conflict actually developed). *See Crout*, at * 4. Alternatively, the Tomahawks could have pursued an action for breach of quiet enjoyment against Roesel Enterprises, since it allegedly leased a portion of the Property to two different lessees (KER Entertainment and the Tomahawks). *See Ott v. Marion Plaza, Inc.,* 1987 WL 16265, *8 (3rd Dist. Aug. 31, 1987).

{¶ 23} Ultimately, we conclude DQ presents no valid legal grounds to deem the Tomahawks Lease void from the beginning, regardless of whether, as the trial court determined, the Tomahawks "believed [it] was contracting [with] the holder of title" for the Property or "could rightly presume the contract valid." At the time DQ purchased the Property, the Tomahawks Lease was valid as a matter of law. DQ presented no genuine issue of material fact to show Roesel Enterprises was not the valid lessor on the date DQ purchased the Property, or that the Tomahawks Lease should have been deemed void prior to that date. The trial court did not err when it granted the Tomahawks motion for summary judgment on DQ's declaratory judgment claim.[7]

{¶ 24}     DQ's first assignment of error is overruled.

### Legal Issue # 2 – DQ's Fraud Claims

*Kenneth's First Assignment of Error and DQ's Third Assignment of Error – Propriety of Summary Judgment Against Kenneth but not Tanya*

{¶ 25} Kenneth argues the trial court erred when it granted DQ's motion for summary judgment and found Kenneth made a fraudulent misrepresentation to DQ when he stated in the Purchase Agreement that no tenants had rights in the Property. Kenneth asserts that there are genuine issues of material fact in dispute regarding whether DQ justifiably relied on that representation. We agree.

{¶ 26} Similarly, DQ argues the trial court erred when it granted summary judgment in favor of Tanya as to DQ's fraud claim against her because there is a genuine issue of material fact regarding whether Tanya signed the Addendum with knowledge of its falsity (or utter disregard for its truth or falsity) and whether she intended to mislead DQ with the Addendum. We agree.

---

7. As a result of the foregoing, we need not address DQ's procedural challenge to the trial court's finding that DQ did not provide the entire KER Lease for review. Further, DQ's asserted errors regarding party presentment have no merit because the Tomahawks previously raised legal defenses similar to this court's reasoning here.

Relevant Facts

{¶ 27} In December of 2019, DQ made an offer on the Property. Derick and Aaron Fry, the general manager of DQ, subsequently conducted several walk throughs of the Property and observed the Tomahawks' shed. DQ's 2019 Offer included a clause requiring Roesel Enterprises to "provide lease termination to existing tenant" and that the tenant would vacate within 60 days of closing. The 2019 Offer was never fully executed, but Winnie signed it. However, the Purchase Agreement executed months later by Winnie and Kenneth stated "No Tenant rights apply" to the Property and that it would be vacant before closing. Yet the "Inspection Report" DQ received before closing noted that the Property included "a free standing metal pole barn structure to the rear of the main building" that was "a storage facility for [the Tomahawks]" who had "current occupancy."

{¶ 28} Despite these documented references to a tenant on the property, Derick maintained that no one at DQ saw or knew about the Tomahawks Lease until litigation began. Kenneth disputed this, stating that he (1) provided DQ with a "box" of documents relating to the Property which purportedly included a copy of the Tomahawks Lease; (2) had spoken with DQ and its representatives about the Tomahawks presence on the Property and they "were willing to let [the Tomahawks] stay"; and (3) believed the representation that "No Tenant rights apply" in the Purchase Agreement concerned only the main commercial building on the Property and not the shed utilized by the Tomahawks.

{¶ 29} Tanya stated via deposition that Derick and Kenneth told her that DQ and the Tomahawks "were in communication working on an agreement" to let the Tomahawks stay at the Property. She claimed she did not know about the Tomahawks Lease because Kenneth handled their businesses' operations.

{¶ 30} Jeff Sprague, the former Treasurer of the Tomahawks, testified via

deposition that during a conversation with Derick following DQ's closing on the property, "[Derick] seemed to be well aware, based on the nature of the conversation, of the existence of the [Tomahawks] lease" and the rental payment of $250 a year. According to Sprague, Derick was not worried about collecting the miniscule rent money. Instead, they discussed how the Tomahawks' continued presence on the Property could benefit both parties—with the Tomahawks having a place to store their equipment and with DQ receiving advertising and recognition for supporting a well-known local organization.[8] Sprague also asserted that he spoke with Aaron multiple times prior to closing about the Tomahawks' continued use of the shed. Finally, Sprague testified that on or before the day of closing, Tanya asked him if the Tomahawks had a lease, and when he affirmed to her they did, she asked him to provide a copy of it to her.

## Ruling by the Trial Court

{¶ 31} DQ moved for summary judgment against Kenneth for fraud, and Tanya moved for summary judgment as to DQ's fraud claim against her. DQ argued that it relied on Kenneth and Tanya's representation in the Purchase Agreement and Addendum that no tenant rights existed on the Property and that DQ was never provided with a copy of the Tomahawks Lease or notified of its existence.

{¶ 32} The trial court granted DQ's motion for summary judgment against Kenneth, noting that "had [DQ] conducted due diligence, it could have easily discovered the encumbrance of the Tomahawks rental agreement." Nonetheless, the trial court found Kenneth committed fraud because Kenneth's "self-serving deposition testimony" about "delivering 'boxes' of documents and diaphanous oral agreements[ ] does not create

8. Sprague further stated that Derick told him Winnie was struggling to understand the benefits of supporting a community organization with this type of deal, but that the Roesels explained that the Tomahawks were a large organization in the local community and that DQ would benefit from supporting it.

material issues of fact for a jury, particularly in light of his longtime support for, and participation in, the Lakota organization." The trial court concluded, without further analysis, that DQ justifiably relied on the statements made in the Purchase Agreement.

{¶ 33} While the trial court found Kenneth liable for fraud, the trial court granted Tanya summary judgment as to DQ's fraud claim against her. The trial court's order stated in relevant part that "Tanya's testimony indicates she left business operations to Kenneth. Additionally, the proffered affidavits of her former attorney and real estate agent as proffered by [DQ], do nothing to rebut her lack of knowledge as to the rental agreement." As a result, the trial court concluded Tanya could not be found to have made a false statement with the intent of misleading DQ when she signed the Addendum.

Fraud

{¶ 34} As a reminder, this court reviews the trial court's decision on summary judgment de novo, giving no deference to its decision. *Total Quality Logistics, L.L.C.*, 2022-Ohio-3969, at ¶ 17. To successfully prove fraud, a plaintiff must demonstrate the existence of:

> a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to its truth or falsity that knowledge may be inferred, (4) with the intent of misleading another to rely on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

*Shannon v. Fischer*, 2020-Ohio-5567, ¶ 15 (12th Dist.). "All of these elements must be present if actionable fraud is to be found. The absence of one element is fatal to recovery." (Cleaned up.) *Westfield Ins. Co. v. HULS Am., Inc.*, 128 Ohio App.3d 270, 296 (10th Dist. 1998).

{¶ 35} "Generally, in arm's-length business transactions, each party is presumed

to have the opportunity to ascertain relevant facts, and therefore, neither party has a duty to disclose material information to the other." *Levy v. Seiber*, 2016-Ohio-68, ¶ 31 (12th Dist.). However, a duty to disclose in business dealings arises when full disclosure is necessary to "*dispel misleading impressions that are or might have been created by partial revelation of the facts*." (Emphasis in original.) *Id*. "'A fact is material if it is likely, under the circumstances, to affect the conduct of a reasonable person with reference to the transaction.'" *Aztec Internatl. Foods, Inc. v. Duenas*, 2013-Ohio-450, ¶ 36 (12th Dist.), quoting *Leal v. Holtyogt*, 123 Ohio App.3d 51, 76 (2d Dist. 1998). The intent to mislead another into relying on a misrepresentation generally must be inferred from a totality of the circumstances. *Id*. at ¶ 42.

{¶ 36} Within the context of fraud, the limits of the buyer's responsibility to discover problems are found in the "justifiable reliance" prong. *Id.* at ¶ 47. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Id*., quoting *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657 (12th Dist. 1996). Thus, justifiable reliance is a fact specific inquiry where the factors the court "should consider include the nature of the transaction, the materiality of the representation or fact concealed, the parties' relationship, and their respective intelligence, experience, age, mental and physical condition, knowledge, and means of knowledge" *Id*., quoting *Fairbanks Mobile Wash, Inc. v. Hubbell*, 2009-Ohio-558, ¶ 26 (12th Dist.).

<u>Analysis</u>

*Summary Judgment Against Kenneth*

{¶ 37} We take no issue with the trial court's conclusion that (1) Kenneth had a duty to disclose the Tomahawks Lease, (2) the existence of the Tomahawks Lease was material to Roesel Enterprises and DQ's transaction, (3) Kenneth knew his representation

- 14 -

in the Purchase Agreement that no tenants' rights applied to the Property was false, (4) Kenneth intended for DQ to rely on this false representation, and (5) DQ was injured by its reliance.[9] However, upon our de novo review of the facts and circumstances of this case, we cannot say whether or not DQ *justifiably* relied on Kenneth's statement in the Purchase Agreement. Stated differently, we conclude a genuine issue of material fact exists as to whether DQ had reason to doubt Kenneth's representation.

{¶ 38} The trial court's finding of fraud essentially rested on its conclusion that Kenneth, by virtue of his longstanding relationship with the Tomahawks, was in the best position to make the Tomahawks Lease expressly known to DQ. While perhaps true, the trial court gave very little, if any, consideration of the other factors relevant to the "justifiable reliance" prong of fraud (i.e. the nature of the transaction, the form and materiality of the representation, the relationship of the parties, their respective means and knowledge, as well as other circumstances applicable here). The relationship between DQ and Roesel Enterprises is the relevant relationship to analyze, not the relationship between Kenneth and the Tomahawks. Regardless of Kenneth's relationship with the Tomahawks, both DQ and Roesel Enterprises were sophisticated actors conducting an arms-length business transaction with the assistance of real estate and legal professionals. As the trial court acknowledged before placing ultimate blame on Kenneth, DQ "could have easily discovered the encumbrance of the Tomahawks rental agreement" if it conducted its own due diligence.

---

9. Kenneth argues that the trial court erred when it found he made a false representation with the intent to mislead DQ. However, in construing the evidence in a light most favorable to Kenneth (the nonmoving party), we hold the trial court did not err in these findings. Kenneth provided no evidence other than his self-serving testimony to support his arguments, which is insufficient for this court to find genuine issues of material fact remain in dispute regarding these elements of fraud. *Camara v. Gill Dairy, LLC*, 2023-Ohio-2339, ¶ 34 (12th Dist.); *Barich v. Scheidler Med. Group, L.L.C.*, 2015-Ohio-4446, ¶ 13 (12th Dist.) (holding "a non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence.").

{¶ 39} In addition, the court determined there was no evidence that DQ knew of the Tomahawks Lease outside of Kenneth's self-serving testimony that he spoke with DQ about the Tomahawks Lease and provided a "box of documents" which included the lease. Not so. For example, the 2019 Offer, signed by Winnie, acknowledged the Property had "an existing tenant" that would vacate the Property within 60 days of closing. Though DQ and Roesel Enterprises did not fully execute the 2019 Offer, DQ cannot disclaim knowledge of this provision.[10] Moreover, the Inspection Report DQ received prior to closing specifically noted the Tomahawks' occupancy and the shed. Derick and Aaron also personally observed the shed during walk throughs of the Property.

{¶ 40} The deposition testimony of Kenneth, Tanya, and Sprague also call DQ's justifiable reliance into question. As discussed above, both Kenneth and Tanya testified that they were told by DQ that DQ was in discussions with the Tomahawks regarding their continued use of the Property after closing. In addition to their (self-serving) testimony, Sprague testified that he had phone conversations with Aaron in the month before DQ closed on the Property in which Aaron assured Sprague the Tomahawks would be able to continue using the shed and that DQ and the Tomahawks needed to meet to discuss this use. Sprague also testified he attended a meeting with Derick and others from the Tomahawks just a couple of months after closing where Derick acknowledged the Tomahawks' yearly rent and sought to better understand how allowing the Tomahawks— a large organization in the community—to stay on the Property could mutually benefit both parties. Sprague's testimony that Derick expressed no surprise regarding—and in

---

10. The Purchase Agreement contained a merger clause, making it the sole contract between the parties, so none of the terms contained in the 2019 Offer would control as a matter of contract interpretation. But the terms of the Purchase Agreement are not in dispute, and DQ's prior knowledge regarding a tenant is not a contract term. Therefore, the merger clause in the Purchase Agreement does not negate the possibility DQ knew of a tenant by virtue of the 2019 Offer.

fact acknowledged—the rent shortly after closing, provides substantiating evidence that it was, at the very least, disputed as to whether DQ knew about the Tomahawks Lease prior to purchasing the Property.

{¶ 41} DQ argues that while it knew of the Tomahawks' "presence in the shed," it "had no reason to believe" that the Tomahawks Lease allowed them to remain on the Property.[11] On the record, this court finds it difficult to reconcile DQ's assertion that it knew only of the Tomahawks' *presence* but not their *tenancy*. We conclude that the trial court erred in finding that no material facts called into question whether DQ justifiably relied upon Kenneth's representation. In other words, we find the trial court erred in definitively finding on a motion for summary judgment that DQ had no reason to doubt Kenneth's representation. The record shows a genuine dispute about whether DQ did not just have a "reason to doubt" Kenneth's representation in the Purchase Agreement, but whether they actually *expressed* such doubt when DQ requested the Addendum prior to closing.

{¶ 42} Given the evidence of (1) DQ's prior explicit knowledge of an "existing tenant"; (2) DQ's undisputed knowledge of the Tomahawks continued occupancy prior to closing; (3) DQ's request for the Addendum; and (4) other communications DQ's representative purportedly had with Kenneth, Tanya, and the Tomahawks prior to and soon after closing, we conclude genuine issue of material fact exist regarding whether DQ justifiably relied upon Kenneth's representation. On remand, DQ must resolve, before a trier of fact, such facts in its favor to justify its reliance on Kenneth's Purchase Agreement representation. Otherwise, DQ's fraud claim against Kenneth must fail.

*Summary Judgment Favoring Tanya*

{¶ 43} For many of the same reasons, summary judgment favoring Tanya was

---

11. While DQ raises this argument in its challenge to the trial court's grant of summary judgment in favor of Tanya, the argument is relevant to DQ's claim against Kenneth.

improper. The trial court's decision relied upon the conclusion that Kenneth handled all the business decisions for both Roesel Enterprises and KER Entertainment. Kenneth also attested that Tanya had no knowledge of, and had not seen, the Tomahawks Lease. Nonetheless, Tanya signed the Addendum before closing, and this Addendum affirmatively stated the Tomahawks would leave the Property upon DQ's demand. In addition, Sprague testified that on or prior to the day of closing, Tanya asked him for a copy of the Tomahawks Lease.[12] This court finds it difficult to see how Tanya can have her cake and eat it too. If Tanya knew nothing about her and Kenneth's businesses or the Tomahawks Lease, we find her affirmative statement in the Addendum and her purported request to Sprague to see the Tomahawks Lease close to the day of closing to be in direct contrast with her alleged lack of knowledge.

{¶ 44} A "positive assertion" of a fact is, by plain implication, an assertion of knowledge concerning the fact." (Cleaned up.) *Curran v. Vincent*, 2007-Ohio-3680, ¶ 22 (1st Dist.). After all, DQ asserts it required this Addendum to go through with the closing. At the very least, DQ's request for the Addendum, combined with Tanya's professed ignorance regarding the business, raises a legitimate question as to whether Tanya acted recklessly by signing the Addendum without first confirming with Kenneth if the Tomahawks had a lease. If a person makes an untrue statement recklessly (i.e., without knowledge or information on the subject) and that statement is found to be calculated to induce reliance, that person can be found liable for fraud. *Id*. Such considerations inform whether Tanya made a false statement, with knowledge of its falsity or with such utter disregard and recklessness as to its truth or falsity that knowledge may be inferred (the

---

12. Moreover, while Kenneth testified Tanya had not previously seen the Tomahawks Lease, he also testified he was not at closing. He would not have first-hand knowledge of the alleged conversation between Sprague and Tanya, and Kenneth could not provide direct evidence regarding whether Tanya acquired knowledge of the Tomahawks Lease from Sprague.

third element of fraud). *Shannon v. Fischer*, 2020-Ohio-5567 at ¶ 15. Of course, DQ still has to prove all the required elements of fraud for its claims against Tanya—including whether it justifiably relied upon the Addendum for "additional assurance" given the disputed facts analyzed in Kenneth's first assignment of error.[13]

{¶ 45} But ultimately, the trial court erred in ruling in Tanya's favor on DQ's fraud claim by relying on Tanya's testimony while disregarding contradicting evidence. This amounts to an improper weighing of evidence at summary judgment, rather than just a review of the evidence to determine if a genuine issue of material fact exists. *Smathers*, 2022-Ohio-4595, at ¶ 32.

{¶ 46} We sustain Kenneth's first assignment of error and DQ's third assignment of error.

*Kenneth's Third Assignment of Error – Relevancy of the Addendum*

{¶ 47} Kenneth asserts the trial court erred in permitting the Addendum to be admitted as an exhibit at trial because it was signed only by Tanya and therefore could not be relevant to DQ's fraud claim against him. Because we found summary judgment against Kenneth for fraud to be improper, we find this assignment of error moot.

*Kenneth's Second and Fourth Assignment of Error – Denial of Directed Verdict and Judgment Notwithstanding the Verdict as to DQ's Fraud Claim*

{¶ 48} In his last two assignments of error, Kenneth argues DQ failed to

---

13. DQ argues on appeal that the Addendum "provided DQ *additional* reassurance that [the Tomahawks] did not have a lease and that [they] could be removed . . . at DQ's discretion." (Emphasis added.) DQ further asserts the Addendum "counter[s] any argument that DQ was at fault in not pursuing [the] issue of whether the Property was burdened by a lease." We note that on remand, such arguments could raise multiple questions, including but not limited to (1) why did DQ feel it was necessary to have *additional* assurances that a lease did not exist given the language of the Purchase Agreement, (2) did DQ believe at any time prior to closing—as a result of the 2019 Offer, the Inspection Report, conversations with Kenneth, Tanya, and Sprague, or any other factors—that the Tomahawks had a legal interest in the Property that potentially conflicted with DQ's purchase of the Property, and (3) if DQ did believe the Tomahawks potentially had a conflicting interest in the Property, could DQ justifiably rely on mere execution of the Addendum—signed only by Tanya who purportedly had no knowledge of her and Kenneth's business operations—to assess the Tomahawks' legal interest the Property? Such considerations again demonstrate the existence of genuine issues of material fact regarding DQ's justifiable reliance that should have been resolved by a jury.

demonstrate at trial that it was proximately or directly damaged by his representations in the Purchase Agreement. As a result, he asserts the trial court should have granted him a directed verdict or a judgment notwithstanding the jury's verdict. Ohio law permits the trial court to "enter a directed verdict in favor of a party or a judgment notwithstanding the verdict if 'reasonable minds' can only come to one conclusion after considering the evidence of the case and the elements of a party's claims." *Batsche v. Batsche*, 2024-Ohio-1234, ¶ 27 (12th Dist.), quoting Civ. R. 50. Because we found summary judgment against Kenneth for fraud to be improper, we find both of these assignments of error moot.

### Legal Issue # 3 – Liability for Damages

*DQ's Second Assignment of Error – Lakota's Damages Award of $150,000 Against DQ*

<u>Relevant Facts</u>

{¶ 49} At trial, the Tomahawks' current treasurer testified that the organization experienced approximately $50,000 in damages related to the relocation of its equipment from the shed on the Property. In addition, the Tomahawks rented space for $1,750 per month and later $3,000 per month, versus the $250 per year under the Tomahawks Lease. The Tomahawks also retained a realtor as an expert witness who testified at trial that the Tomahawks would experience $570,000 in additional expenses over the course of the remaining term of the Tomahawks Lease. However, the jury only awarded Lakota $150,000.

<u>Applicable Law</u>

{¶ 50} Ohio courts have long acknowledged that in lease disputes, damages are "the difference between the fair market rental of the property proposed to be leased and the agreed rental to be paid in the proposed lease, such sum discounted to present value, together with any special damages arising from the breach." *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.*, 47 Ohio St.2d 154, 158 (1976); *see also Neyer Holding II,*

*Inc. v. Huang*, 2025-Ohio-1776, ¶ 62 (12th Dist.).

{¶ 51} Generally, contractual damages must be proven with "'reasonable certainty.'" *Woehler v. Brandenburg*, 2012-Ohio-5355, ¶ 35 (12th Dist.), quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144 (9th Dist. 1996). "[D]amages are not uncertain merely because they cannot be calculated with absolute exactness; it is sufficient if the evidence affords a reasonable basis for computing damages, even if the result is only an approximation." *Id.* In addition to being reasonable, damages must be "'foreseeable as a probable, as distinguished from a necessary, result of [the breaching party's] breach.'" *Neyer* at ¶ 78 (12th Dist.), quoting 1 Restatement of the Law 2d, Contracts, § 351 (1981), Comment a.

## Standard of Review

{¶ 52} On appeal, we review an award of damages under a manifest weight of the evidence standard. *Henry v. Richardson*, 2011-Ohio-2098, ¶ 11 (12th Dist.). Under this standard, "a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal." *Chasteen v. Dix Rd. Property Mgt. LLC*, 2021-Ohio-463, ¶ 43 (12th Dist.). While still independently reviewing the evidence before the trial court, this court affords deference to the trier of fact's judgment, particularly on closely contested issues of fact. *See Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. That is, if the evidence presented to the trial court is "'susceptible of more than one construction,'" this court must make a "'reasonable presumption'" in favor of the judgment below. *Id.* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984), fn. 3.

## Analysis

{¶ 53} The Tomahawks do not raise any issues on appeal regarding the damages

award. However, DQ argues the jury's award of $150,000 was against the manifest weight of the evidence. First, DQ argues the damages were not foreseeable because rent for $250 per year was far below market value and totaled just $5,000 over the course of the 20-year lease. DQ further asserts "there was no evidence . . . [as to] what [Kenneth and the Tomahawks] felt the damages would be in the event of breach" meaning the Tomahawks could not demonstrate any foreseeability as to its damages. Finally, DQ argues the Tomahawks' evidence of damages, "even though not completely accepted by the jury, was well beyond reason . . ." because the "shed was bare-bones, with little in the way of amenities" and Lakota's expert did not use appropriate comparable properties when calculating damages.

{¶ 54} DQ's emphasis on what value the contracting parties believed the Tomahawks Lease had or what they "felt" damages would be in the event of a breach are simply not relevant because—as DQ recognizes—the goal of contract damages is to put the parties in the place they would have been if there had been no breach. Through the testimony of the Tomahawks' treasurer and expert witness (as well as associated exhibits), the Tomahawks presented various data points for the jury to consider when evaluating the Tomahawks' damages. While the jury did not provide reasoning on how it arrived at its determination of damages, it is reasonable based upon the record to conclude that the jury agreed with DQ that the Tomahawks' purported damages of $570,000 was far too much to award under these circumstances. But it is also reasonable to conclude the jury picked a significantly lower number to try to at least make the Tomahawks reasonably whole, given DQ's breach and the Tomahawks' subsequent need to secure much more expensive facilities. We see no reason to conclude the jury's award was against the manifest weight of the evidence or resulted in a manifest miscarriage of justice.

{¶ 55} We overrule DQ's second assignment of error.

**Legal Issue #4 – Attorney Fees**

*The Tomahawks' First and Second Assignments of Error – Denial of Fees After Summary Judgment, Denial of Block Billed Attorney fees, and the Court's Blanket Reduction in Fees*

Relevant Facts and Ruling by the Trial Court

{¶ 56} The trial court found the Tomahawks Lease to be valid, granted the Tomahawks' motion for summary judgment as to DQ's declaratory judgment claim, and found DQ's quiet title and slander of title claims moot. The Tomahawks had requested attorney fees as part of its counterclaim, asserting the fees for defending the validity of the Tomahawks Lease were recoverable because they, as a grantee under the Tomahawks Lease, were compelled to defend the title conveyed by Roesel Enterprises. After granting the Tomahawks summary judgment on the lease validity question, the trial court did not render a decision on the question of the Tomahawks' entitlement to fees for that claim—instead sending that question to the jury at trial.

{¶ 57} At trial, DQ argued its unjust enrichment claim—its only remaining claim against the Tomahawks, concerned only "the value of the rental agreement" which was $5,000, representing 20 years of rent at $250 per year. In closing arguments, the Tomahawks acknowledged DQ was "entitled to that setoff" of $5,000 after first considering the Tomahawks additional costs after vacating the Property.[14]

{¶ 58} The jury awarded DQ $0 for unjust enrichment, $150,000 to DQ against Kenneth for fraud, and $150,000 to the Tomahawks against DQ for breach of contract. In addition, the jury found the Tomahawks were entitled to attorney fees, in an amount to be

---

14. The Tomahawks moved (twice) to bifurcate the trial between the issues related to the damages it sustained by DQ's breach (after accounting for the setoff for unjust enrichment) and the issue related to DQ's damages for its fraud claim against Kenneth. The trial court denied both motions to bifurcate.

determined by the court.

**{¶ 59}** After trial, the Tomahawks moved the trial court to order DQ to pay the Tomahawks' $204,658 in attorney fees, and the trial court held an evidentiary hearing on this issue. The Tomahawks and DQ presented expert testimony to the trial court regarding attorney fees. The Tomahawks' expert testified that the fees the Tomahawks sought were reasonable because the case contained intertwined legal issues that could not be separated. DQ's expert opined that the work for the unjust enrichment claim and breach damages could be separated but that the Tomahawks' attorneys should be compensated for their trial work.

**{¶ 60}** The trial court determined that the Tomahawks were entitled to attorney fees only for work which was "related to defending the validity" of the Tomahawks Lease and awarded the Tomahawks $7,901.50 in attorneys' fees. In doing so, the trial court found the hourly rate of the Tomahawks attorney fees of $350 reasonable. However, the court noted it was "not able to determine the precise amount of time . . . that [the Tomahawks] expended defending the validity of the Rental Agreement, not because the claims involved a common core of fact or related legal theories, but because [the Tomahawks] attorneys used block billing when invoicing." In addition, the court found that "the other claims and counterclaims [of the parties] are not so intertwined where DQ should be responsible for all of the fees billed from the commencement of suit until summary judgment (May 6, 2021, through August 9, 2022)." Based on these two conclusions, the trial court "divid[ed] the total amount billed for the applicable time period by the total number of claims [eight], leaving The Tomahawks entitled to one-eighth of the fees" billed prior to summary judgment. The trial court denied the Tomahawks any attorney fees following summary judgment.

- 24 -

## Standard of Review

{¶ 61} We review the trial court's reward of attorney fees, including block billing, for an abuse of discretion. *State ex rel. Hicks v. Clermont Cnty. Bd. of Commrs.*, 2021-Ohio-998, ¶ 61-62. (12th Dist.), *overruled on other grounds*, *State ex rel. Hicks v. Clermont Cnty. Bd. of Commrs.*, 2022-Ohio-4237. Once again, the trial court abuses its discretion if its "decision was unreasonable, arbitrary, or unconscionable." *Ostigny v. Brubaker*, 2024-Ohio-384, ¶ 20 (12th Dist.). When making a fee determination, "the trial court shall make the necessary findings to enable this court to conduct a meaningful review should that decision again be appealed." *Nationwide Agribusiness Ins. Co. v. Heidler*, 2019-Ohio-4311, ¶ 35 (12th Dist.). Unless the amount awarded "is so high or so low as to shock the conscience" a trial court's award of attorney fees should be upheld. *Bittner v. Tri-Cnty. Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). *See also Total Quality Logistics, LLC v. Integrity Express Logistics*, LLC, 2021-Ohio-4242, ¶ 50 (12th Dist.).

## Applicable Law

{¶ 62} Ohio follows the "American Rule" for attorneys' fees, and litigants are generally not entitled to recover them unless (1) a statute provides for their recovery; (2) a contract provides for their recovery; or (3) the losing party is found to have acted in bad faith. *Burdick v. Burd Bros., Inc.*, 2019-Ohio-1593, ¶ 18 (12th Dist.). "However, where the claims can be separated into a claim for which fees are recoverable and a claim for which no fees are recoverable, the trial court must award fees only for the amount of time spent pursuing the claim for which fees may be awarded." *Kinder v. Smith,* 2013-Ohio-2157, ¶ 20 (12th Dist.).

{¶ 63} After answering whether attorneys' fees are recoverable, the court's determination of reasonable attorney fees is a two-part process. Courts first perform a "lodestar" calculation by multiplying an attorney's reasonable hours expended by a

reasonable hourly rate. *Hicks*, 2021-Ohio-998 at ¶ 51. Second, the court may adjust the lodestar amount by considering factors such as the skills, experience, and knowledge required for the legal work. *Id.*, citing Prof.Cond.R. 1.5.[15]

{¶ 64} A common issue in evaluating reasonable attorney fees is the use of "block billing" which "involves the practice of listing multiple tasks in a single paragraph followed by the total amount of time spent on all tasks." *Hicks* at ¶ 58. We have previously noted that "block billing is disfavored by both clients and courts, as it makes it difficult, if not impossible, to determine the reasonableness of a fee request." *Id.*[16] Nonetheless, "[w]e also recognize that experienced trial judges who are familiar with attorney billing and litigation practice may determine that the tasks described in block-billed entries and the total time expended on all tasks was reasonable." *Id.* at ¶ 60. When block billed attorney fees are awarded, the trial court "should articulate the factors upon which the fees were determined to be reasonable despite having been block-billed." *Id.*

## Analysis

{¶ 65} The Tomahawks assert the trial court improperly awarded fees only up to the date on which it granted their motion for partial summary judgment as to DQ's declaratory judgment action. The Tomahawks contend the legal issues presented in the declaratory judgment action are "inextricably linked" with DQ's and the Tomahawks' other

---

15. "The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent." Prof.Cond.R. 1.5.

16. Such concerns led Ohio's Supreme Court to categorically deny block billing on cases appealed to it. *See generally State ex rel. Harris v. Rubino*, 2018-Ohio-5109. This court, however, has not entirely banned block billing. *Hicks*, at ¶ 60.

causes of action, meaning more fees should have been granted because the Tomahawks still had to defend itself against DQ's unjust enrichment claim through trial.[17] In addition, the Tomahawks argue the trial court arbitrarily excluded all "block billed" entries when calculating its attorney fees and applied an incorrect blanket reduction to their fees based upon the court's conclusion they only "succeeded" on one out of eight claims.

*Inextricably Linked Claims and Counterclaims Prior to Summary Judgment*

{¶ 66} As far as what attorney fees the Tomahawks were entitled to, the Tomahawks focus on the intertwining of DQ's claims and their counterclaims to argue they should have been awarded fees for their trial work. We address that below but examine the trial court's reasoning in context for abuse of discretion. Within that context, the trial court's conclusion that the parties' claims and counterclaims were not "intertwined" prior to summary judgment was unreasonable and arbitrary. While the trial court analyzed why the Tomahawks could recover fees for the issues surrounding the validity of the Tomahawks Lease, it blamed the Tomahawks' block billing, instead of a "common core of fact or related legal theories," for its inability to determine the time devoted to the lease validity question. The trial court's conclusion, without support or analysis beyond block billing, that "the other claims and counterclaims are not so intertwined" as to make DQ responsible for all the fees billed prior to summary judgment do not demonstrate a reasoned approach to fees.[18]

{¶ 67} As the trial court correctly noted, when multiple claims are "rooted in the

---

17. We note that DQ does not contest whether the Tomahawks were entitled to attorney fees in the first place. DQ only asserts the trial court did not abuse its discretion when calculating the award.

18. In addition, the trial court's attorney's fee award to the attorneys representing the Tomahawks totals just 3% of the fees they requested. Awarding 3% to attorneys whose success in the face of extensive and aggressive litigation led directly to a six-figure award of damages for their client is unreasonable and unconscionable on its face. While an award of fees is not always possible under Ohio law, when it is, a trial court should not lower the award to a facially unreasonable amount. In the same way anyone deserves fair compensation for a job well done, so do attorneys (despite lawyer jokes, which are funnier when one has no need for an attorney).

same allegations, facts, discovery, and legal arguments, a trial court does not abuse its discretion in awarding attorney fees for the time spent on the claims." *Edlong. Corp. v. Nadathur*, 2013-Ohio-1283, ¶ 16 (1st Dist.). Even a cursory review of the record supports a reasoned conclusion that DQ's claims against the Tomahawks and the Tomahawks' counterclaims against DQ were factually and legally intertwined prior to summary judgment. Virtually all of the relevant facts, discovery, and evidence focused on the validity of the Tomahawks Lease prior to summary judgment. For instance, a quick glance at the motions for summary judgment for the relevant claims and counterclaims shows that the vast majority of the briefing focused only on the question of the validity of the Tomahawks Lease (e.g., the Tomahawks only devoted four short paragraphs to other issues in its motion for summary judgment). It is obvious why this is so—if DQ's efforts to invalidate the lease were successful, the Tomahawks' counterclaims would all fail, while if the Tomahawks prevailed on that issue, they were virtually assured of success on one of their breach claims. In fact, the Tomahawks presented uncontroverted evidence (in one short paragraph) on summary judgment supporting DQ's breach if the court found the Tomahawks Lease valid.

{¶ 68} The trial court also correctly noted it can only award fees for "the amount of time spent pursuing the claim for which fees *may* be awarded," but that is only so where it is *possible* to separate claims in such a manner." *Bittner*, 58 Ohio St.3d at 145. (Emphasis added.) If, as is the case here, the claims for relief involved "a common core of facts or [were] based on related legal theories," then dividing the hours on a claim-by-claim basis is difficult. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). It logically follows that if the court *must* award fees—as the jury's verdict requires here—and if it is *virtually impossible* to separate claims—the court *must* award fees for all work deemed reasonable under the Lodestar method.

**{¶ 69}** There is simply very little evidence that either DQ or the Tomahawks spent much time at all prior to summary judgment on any question other than the validity of the Tomahawks Lease. Therefore, we find that, prior to summary judgment, DQ's claims against the Tomahawks and the Tomahawks' counterclaims against DQ were "inextricably linked" and the Tomahawks should be awarded all fees deemed reasonable under the Lodestar method. Next, the trial court's conclusions regarding the Tomahawks' block billing must be addressed within the context of these inextricably linked claims.

*Block Billing*

**{¶ 70}** The trial court found that it could not determine the "precise amount of time devoted that [the Tomahawks] expended defending the validity of the Rental Agreement, not because the claims involved a common core of fact or related legal theories, but because [their] attorneys used block billing when invoicing." The trial court's conclusion regarding block billing was premised on the unreasonable conclusion that it would be possible to separate the work done for just the lease validity question prior to summary judgment.

**{¶ 71}** The trial court further abused its discretion by making no attempt to determine whether the tasks described and time spent for those tasks in the block billed entries submitted by the Tomahawks were reasonable. As a result, we are unable to conduct any meaningful review in this regard. But again, even a cursory review of the billing records submitted to the trial court show that most of the block-billed entries contain (1) several tasks that are closely related to one another (e.g. multiple emails to the same person, research and conferences related to the same issue); and/or (2) billing for relatively small increments of time (e.g., 0.2 hours, 0.9 hours, etc.). The trial court is experienced with attorney billing and litigation practice and can therefore make a reasoned determination if the "tasks described in the block-billed entries and the total

time expended on all tasks was reasonable." *Hicks*, 2021-Ohio-998, at ¶ 60. Upon remand, we hold the trial court must review the block-billed entries to determine if the total amount of time billed for the multiple tasks is reasonable (i.e., whether sending two emails justifies billing 0.2 hours). If so, those fees prior to summary judgment are compensable.

*Blanket Reduction for "Unsuccessful" Claims*

{¶ 72} The Tomahawks also challenge the trial court's seven-eighths blanket reduction to attorney fees accrued before its summary judgment decision based only on the number of claims and counterclaims between the parties. We find this blanket reduction was arbitrary. *See Hicks*, 2021-Ohio-998, ¶ 62 (12th Dist.) (rejecting appellant's argument that the "entire fee application should be reduced by two-thirds based simply upon the number of claims involved in the case, rather than the work attributable to each claim.").

{¶ 73} First, the basic math is incorrect—only seven of the claims and counterclaims related to the Tomahawks—DQ's fraud claim only related to Kenneth and Tanya. If a theoretical blanket reduction was made, it should have been by six-sevenths. But even that would be arbitrary under our precedent.

{¶ 74} Second, while the trial court attempted to focus on the Tomahawks' limited "success" with this reduction, it failed to recognize there is a huge difference between having a claim denied and having a claim be deemed moot because of the party's success on an interrelated claim (mooting the other claims further supports how "intertwined" they all were). Here, the Tomahawks succeeded on the lease validity question, making it completely *unnecessary* for any decision to be made on DQ's claims for quiet title or slander of title, or for the Tomahawks' promissory estoppel claim.[19] The Tomahawks'

---

19. As to DQ's undismissed claim of unjust enrichment, the parties agreed at trial that DQ's unjust enrichment claim solely represented a $5,000 "setoff" of any damages awarded to the Tomahawks in their

success—not their failure—led directly to the mootness of the ancillary, intertwined claims and counterclaims.

{¶ 75} Prior to summary judgment, the trial court erred in finding, without analysis, that the claims were not "intertwined." Further, it erred by not attempting to determine if the block-billed time was reasonable according to the Lodestar method. Finally, the trial court erred by applying a blanket reduction to the fees accrued prior to summary judgment. Upon remand, the trial court should award the Tomahawks all fees prior to summary judgment it deems reasonable under the Lodestar method after a careful and thorough review of the billing records. Next, we turn to the Tomahawks' assertion that the trial court erred in not awarding fees for any work done at trial.

*Fees for Trial*

{¶ 76} The trial court denied the Tomahawks any recovery of attorney fees after summary judgment, which the Tomahawks challenge on appeal. The Tomahawks assert that the fees at trial are recoverable largely on the same "intertwining" of claims argument they raised on fees prior to summary judgment.

{¶ 77} The jury determined the damages DQ owed to the Tomahawks for its breach of the Tomahawks Lease. On the record before this court, it appears that, prior to summary judgment, the Tomahawks billed for virtually no time related to the question of damages they incurred due to DQ's breach. We find that the question of damages the Tomahawks had to prove at trial is directly and solely related to its breach counterclaim

---

breach of contract claim. Such a setoff is inherent in any breach of contract suit, making an unjust enrichment claim moot, so this court is perplexed as to why the unjust enrichment claim proceeded to trial. *See F. Enterprises, Inc.*, 47 Ohio St.2d at 158 (holding rental damages "is the difference between the fair market rental of the property proposed to be leased and the agreed rental to be paid in the proposed lease, such sum discounted to present value, together with any special damages arising from the breach"); *see also Turner v. Langenbrunner*, 2004-Ohio-2814, ¶ 38 (12th Dist.) (holding "[b]ecause there is a valid, enforceable contract in this case, the doctrine of unjust enrichment is not applicable."). Nonetheless, this court recognizes that question is not before it, nor is it consequential to the calculation of fees prior to summary judgment.

against DQ, and any fees solely related to that counterclaim are not recoverable. At trial, the validity of the Tomahawks Lease was not intertwined at all with the question of the damages the Tomahawks sustained, so it is not impossible to separate these fees from work intertwined with the compensable lease validity issue prior to trial.

{¶ 78} The Tomahawks characterize the damages as "simply the flip side of the lease validity question" and argue those fees should be recoverable. Not so. The damages are an *element* of the Tomahawks' wholly separate *counterclaim* for breach of contract and/or the covenant of quiet enjoyment. As discussed above, Ohio law does not permit recovery of attorney fees for a breach claim when the fees are wholly separate and easily delineated from fees related to another, compensable issue.[20] The Tomahawks' work related to the lease validity was intertwined with all the other claims and counterclaims prior to summary judgment. But following summary judgment, only the question of damages on the breach claim (and the relatively straightforward setoff of $5,000 for "unjust enrichment") remained. Therefore, the Tomahawks' work related to the breach counterclaims was no longer inextricably linked to the lease validity work.

{¶ 79} But for the trial court to wholly exclude all fees related to the trial was arbitrary because (1) the jury itself determined the Tomahawks were entitled to attorney fees and (2) the Tomahawks were required to present evidence and argument to the jury supporting its claim for fees. Upon remand, the trial court should carefully consider how much time the Tomahawks billed at trial reasonably related to its fee request to the jury. Those fees would be recoverable as they are unrelated to the question of damages and are instead directly related to the question of fees.

{¶ 80} In summary, upon remand, the Tomahawks should be awarded *all* attorney

---

20. Of course, Ohio law permits fee recovery for a breach if a contract provides for that recovery. But that is not the case here.

fees which accrued prior to summary judgment that the trial court deems reasonable under the Lodestar method after its careful and thorough examination of the billing records, including block billed entries. Following summary judgment, the Tomahawks would only be entitled to any fees it can demonstrate directly relate to its presentation and argument to the jury for an award of attorney fees.

{¶ 81} These assignments of error are sustained in part and overruled in part.

## Conclusion

{¶ 82} The trial court properly determined that the Tomahawks Lease was valid and that DQ was liable to the Tomahawks for breaching that valid lease. Likewise, we find no error in the jury's determination that the Tomahawks sustained $150,000 in damages due to DQ's breach. However, the question of whether Kenneth and/or Tanya committed fraud when selling the Property to DQ should have been presented to a jury— only if a jury determines one, or both, is liable for fraud can DQ be awarded damages (not to exceed $150,000).

{¶ 83} In addition to the foregoing, the trial court must reassess the Tomahawks attorney's fee award from the period of May 6, 2021, through August 9, 2022, and determine whether the tasks described in block billed entries and the total time expended on all tasks during that period were reasonable. The Tomahawks are entitled to an award of all reasonable fees up to August 9, 2022. In addition, the Tomahawks are entitled to an award of all reasonable fees for their work at trial that is directly related to their request to the jury for an award of fees.

{¶ 84} Judgment affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

HENDRICKSON, P.J., and BYRNE, J., concur.

## JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be split equally among all parties (25%).

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Matthew R. Byrne, Judge

/s/ Melena S. Siebert, Judge